# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WHALE AND DOLPHIN CONSERVATION | ) | |
| 7 Nelson Street | ) | |
| Plymouth, MA 02360 | ) | |
| | ) | Civ. No. _____ |
| DEFENDERS OF WILDLIFE | ) | |
| 1130 17th Street NW | ) | |
| Washington, DC 20036 | ) | |
| | ) | |
| CONSERVATION LAW FOUNDATION | ) | |
| 62 Summer Street | ) | |
| Boston, MA 02110 | ) | |
| | ) | |
| CENTER FOR BIOLOGICAL DIVERSITY | ) | |
| 378 N. Main Avenue | ) | |
| Tucson, AZ 85701 | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL MARINE FISHERIES SERVICE | ) | |
| 1315 East-West Highway | ) | |
| Silver Spring, MD 20910 | ) | |
| | ) | |
| WILBUR ROSS, *in his official capacity* | ) | |
| *as Secretary of Commerce* | ) | |
| U.S. Department of Commerce | ) | |
| 1401 Constitution Avenue NW | ) | |
| Washington, DC 20230 | ) | |
| | ) | |
| *Defendants*. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      Plaintiffs Whale and Dolphin Conservation, Defenders of Wildlife, Conservation Law Foundation, and Center for Biological Diversity ("Plaintiffs") challenge the unreasonable delay by the Secretary of Commerce, acting through the National Marine Fisheries Service ("NMFS") (collectively, "Defendants"), in responding to Plaintiffs' "Petition for Rulemaking to Prevent Deaths and Injuries of Critically Endangered North Atlantic Right Whales from Ship Strikes" dated June 28, 2012 ("2012 Petition") and Plaintiffs' "Petition for Rulemaking to Prevent Deaths and Critically Endangered North Atlantic Right Whales from Vessel Strikes" dated August 6, 2020 ("2020 Petition").

2.      The North Atlantic right whale (*Eubalaena glacialis*) is one of the most endangered large whales in the world. Despite nearly fifty years of federal protections under the Endangered Species Act ("ESA") and the Marine Mammal Protection Act ("MMPA"), the North Atlantic right whale (also referred to hereafter as the "right whale") has not recovered.

3.      The International Union for Conservation of Nature recently changed the species' status from "endangered" to "critically endangered," the last step before "extinct in the wild." This designation means that the right whale is considered at high risk for global extinction. In 2019, NMFS categorized the right whale as one of nine species whose extinction is almost certain in the immediate future if existing threats are not dramatically reduced.

4.      The right whale population has been in decline since 2010. In an ongoing Unusual Mortality Event that began in June 2017, 32 deaths and 14 serious injuries have been documented. ("Serious injury" is a term of art under the MMPA, meaning that NMFS has determined that the animal, although alive at last sighting, is likely to die of its injuries.) This

number significantly underestimates the true number of mortalities. NMFS has determined that 40 to 60 percent of right whale mortalities are never observed.

5.     In October 2020, NMFS announced that it had adjusted its right whale population estimates for the past two years significantly downward. The agency's preliminary population estimate for the number of right whales alive in January 2019 is 366 right whales. NMFS also revised its preliminary estimate for the number of right whales alive in January 2018 from 412 down to 383 right whales.

6.     In the same October 2020 announcement, NMFS stated that, since the population's peak of 481 right whales in 2011, after accounting for the birth of 103 calves, approximately 218 right whales have died of presumed anthropogenic causes—a rate of roughly 24 whale deaths per year.

7.     The North Atlantic Right Whale Consortium recently issued its 2020 Annual Report Card. Taking the January 2019 estimate of 366 right whales and subtracting the ten observed deaths in 2019, the Report Card states that the best population estimate for the end of 2019 is 356 right whales. This number does not account for two observed deaths in 2020. Over the last four years (2017–2020), observed mortalities have outnumbered births by three to two.

8.     Right whale scientists believe there may be as few as 70 breeding females left. They warn that the species faces functional extinction within ten to twenty years, if the trends of low birth rates coupled with high death rates eliminate these breeding females. In recent years, more deaths of adult females than adult males have been recorded. There are now more adult males than adult females and the gender gap is widening.

9.     Although their potential lifespan is probably 70 years and could be 100 years or more based on the lifespans of closely related whale species, right whales are killed by human

2

activities before they can die of old age. Female right whales are now only living to around 45 years and males only to around 65 years because of human-caused mortality.

10.    Vessel strikes are one of the two primary human-caused threats inhibiting the species' recovery and threatening its survival (the other is entanglements in fishing gear). No other causes of mortality for right whales who survive their first year have been documented. Adult females, juveniles, and calves are more susceptible to dying from vessel strikes and entanglements than adult males.

11.    In its most recent MMPA Stock Assessment Report for 2019, which covers the five-year period from 2013–2017, NMFS established an annual potential biological removal number of 0.8. This is how many right whales NMFS currently estimates may be killed each year as a result of human activity and still allow the species to reach its optimum sustainable population. Reported annual serious injuries and deaths averaged nearly eleven times this level from 2018 to 2020. As of January 12, 2021, NMFS has already recorded a new seriously injured right whale observed off the Georgia/Florida state border. The annual potential biological removal number of 0.8 has already been exceeded for 2021.

12.    In 2008, NMFS invoked its authorities under the ESA and MMPA to promulgate a regulation implementing vessel speed restrictions in specific areas and seasons along the right whale's migratory route from Massachusetts to Florida ("Vessel Speed Rule" or "Rule"). The Rule's mandatory speed restrictions apply only to vessels 65 feet or longer. Although NMFS eliminated the initial five-year sunset provision in 2013, over the past 12 years, NMFS has never substantively modified the Vessel Speed Rule to apply mandatory speed restrictions to vessels under 65 feet or to expand the areas, seasons, or circumstances in which these restrictions apply.

13.     Since 2013, at least 12 right whale-vessel collisions have been documented in U.S. waters. Of these, NMFS determined four resulted in mortalities or serious injuries. Within the last year alone, vessel strikes in U.S. waters were responsible for the mortality or serious injury of two of the ten calves born in the 2019–20 calving season.

14.     In 2012, three Plaintiffs petitioned NMFS to expand the scope of the Vessel Speed Rule to incorporate additional measures to protect vulnerable right whales from deadly vessel collisions. NMFS has never responded to this petition. In 2020, in response to the ongoing Unusual Mortality Event that began in 2017 and the documented mortalities and serious injuries due to vessel strikes in U.S. waters, all Plaintiffs petitioned NMFS to expand the scope of the Rule. To date, NMFS has not responded to this petition either.

15.     Given the ever-worsening population status of the North Atlantic right whale, and in light of the agency's statutory obligations to protect this species, NMFS's protracted failure to act on these Petitions constitutes agency action unreasonably delayed under the Administrative Procedure Act ("APA"). Plaintiffs seek an order from the Court setting a date certain for NMFS to remedy these violations.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, including the APA. An actual, justiciable controversy exists between Plaintiffs and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706. The APA waives Defendants' sovereign immunity. 5 U.S.C. § 702.

17.     Venue in this Court is proper under 28 U.S.C. § 1391(e)(1). This action is brought against NMFS, an agency of the United States and the Secretary of Commerce, an officer of the

United States acting in his official capacity. The Department of Commerce, of which NMFS is a component agency, is headquartered in Washington, DC. In addition, Plaintiff Defenders of Wildlife is headquartered in Washington, DC, and Plaintiff Center for Biological Diversity maintains an office in this judicial district.

## PARTIES

### Plaintiffs

18.     Plaintiff Whale and Dolphin Conservation, Inc. ("WDC," formerly known as Whale and Dolphin Conservation Society) is part of Whale and Dolphin Conservation's global network of charities based in the United States, the United Kingdom, Germany, and Australia. Together, these charities form the world's largest organization dedicated solely to the protection of whales, dolphins, and porpoises and their environments. WDC has over 200,000 members and supporters in the United States. WDC and its members and supporters have worked extensively to preserve the critically endangered North Atlantic right whale and its habitat. WDC is incorporated in Massachusetts, with its main office located in Plymouth, MA. WDC frequently comments on proposed rules and draft permits regarding the protection and conservation of North Atlantic right whales. WDC is a signatory to the 2012 and 2020 Petitions.

19.     WDC brings this action on behalf of itself and its members and supporters, many of whom enjoy observing, photographing, studying, and appreciating the North Atlantic right whale in its natural habitat. WDC works with commercial whale watching companies through its Whale SENSE program. As a founding partner of Whale SENSE, WDC-trained naturalists and interns have educated more than one million passengers a year aboard commercial whale watching vessels throughout the Northeast and mid-Atlantic (from Maine to Virginia) regarding

the plight of the North Atlantic right whale. WDC members and supporters also regularly whale watch from land and water whenever possible and will continue to do so in the future.

20.     For example, one WDC member who resides in Massachusetts, on Cape Cod Bay, looks for right whales every day, particularly during the winter and spring months when right whales come into Cape Cod Bay to feed. This person alone reports an average of 6–15 right whale sightings each year to the NOAA Sightings Advisory System. This person regularly volunteers for WDC outreach events where information on right whales is provided. This person was instrumental in WDC's ability to obtain and transport an inflatable, life-sized North Atlantic right whales for educational events.

21.     Plaintiff Defenders of Wildlife ("Defenders") is a nonprofit 501(c)(3) membership organization dedicated to the protection and restoration of all native wild animals and plants in their natural communities and the preservation of the habitats on which these species depend. Headquartered in Washington, DC, Defenders has regional and field offices in Alaska, Arizona, California, Colorado, Florida, Montana, New Mexico, North Carolina, Ohio, Oregon, Texas, Washington, and Wyoming. Defenders has nearly 1.4 million and supporters across the United States, including more than 337,000 members in states bordering the Atlantic Ocean where right whales live, feed, breed, and migrate.

22.     Defenders has been a leader in the conservation community's efforts to protect and recover the critically endangered North Atlantic right whale for more than fifteen years through litigation, legal advocacy, and support for legislation and congressional appropriations. Defenders is a signatory to the 2012 and 2020 Petitions.

23.     Defenders brings this action on behalf of itself and its members, many of whom enjoy observing, photographing, and appreciating the North Atlantic right whale in its natural

habitat. Defenders' members regularly engage in these activities in various locations along the Atlantic Coast from land and water and will continue to do so in the future.

24.     For example, one Defenders member who resides in Florida looks for right whales every time she is at the beach, particularly during the winter months when pregnant female right whales migrate to the warm, shallow waters off Florida and Georgia to birth and nurse their calves. This member volunteered for Defenders at the eleventh annual Right Whale Festival in Fernandina Beach in November 2019 to educate members of the public on the importance of protecting right whales. She spent all her free time during the festival at the beach looking for right whales. But for the pandemic that necessitated canceling the 2020 festival, she would have volunteered again. When the Right Whale Festival resumes, she will again volunteer will look for right whales from the beach in her free time. This member has previously gone whale-watching in Iceland (part of the right whale's historic range, where right whales can sometimes be spotted) and has concrete plans to return to Iceland in August 2021 to go whale-watching again (pandemic permitting).

25.     Plaintiff Conservation Law Foundation ("CLF") is a nonprofit Massachusetts corporation with its principal office in Boston, Massachusetts. Founded in 1966, CLF is a member-supported environmental organization with offices in Massachusetts, Maine, New Hampshire, Vermont, and Rhode Island. CLF advocates using law, science, and economics to solve the problems threatening New England's natural resources and communities. For decades, CLF has worked to promote marine conservation and stewardship and to revitalize New England's once-legendary ocean resources. CLF has a longstanding interest in ensuring the survival of the right whale and has been litigating to protect right whales from various threats for more than 20 years. CLF has more than 4,700 members, most of whom reside in the Northeast

U.S. where right whale forage for several months every year. CLF is a signatory to the 2020 Petition.

26.     CLF brings this action on behalf of itself and its members, many of whom derive significant scientific, recreational, spiritual, and aesthetic benefits from endangered right whales. Their interests in observing, studying, and appreciating right whales in their marine habitat depend on a viable population of right whales that contributes to a healthy, functioning ocean ecosystem. CLF's members regularly engage in activities such as observing, studying, and photographing right whales from land and water and will continue to do so in the future. CLF's members have been active in promoting the right whale's recovery from its endangered status. CLF and its members are alarmed and distressed by the species' declining abundance, the troubling number of recent mortalities, and federal regulators' failure to take effective management action to address vessel speed restrictions, all of which jeopardize the species' very survival.

27.     For example, one CLF member is a resident of Nahant, MA with a strong interest in protecting the ocean waters around Nahant. She is the president of the non-profit "Safer Waters In Massachusetts," created in 1967 to protect regional waters, beaches, and land from pollution and other harms. In 2016, she had a moving experience with a North Atlantic right whale that visited and swam in those waters. Her experience viewing the whale in such close proximity was highly emotional and personal. Since then she has tried to make a difference for the future of right whales by educating her community about their plight and engaging with other nonprofit organizations to generate additional protections. On March 22, 2020, she observed five North Atlantic right whales feeding close to shore between Nahant and Marblehead. She reported these sightings to NMFS and provided her photographs to the agency to help identify individual

whales in the area. She continues to monitor her regional waters in hopes of viewing and photographing right whales. She publicizes sightings and includes factual information about the tragic plight of the North Atlantic right whale via her organization's email distribution list (about 450 people strong). Her work to educate others about the dire condition of the population is an ongoing and significant part of her personal and recreational life. She is materially harmed by Defendants' failure to sufficiently protect the species.

28.     Plaintiff Center for Biological Diversity ("Center") is a nonprofit 501(c)(3) organization incorporated in the State of California with offices across the country, including in Washington, DC, California, Arizona, Florida, New York, Oregon, and Washington, and in Baja California Sur, Mexico. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats both in the United States and abroad. The Center has over 81,800 active members, including members who reside in and travel to states along the U.S. Eastern Seaboard where right whales feed, breed, and migrate. Through its Oceans Program, the Center has worked for years to protect marine mammals in the United States and overseas, including seeking protections for these species from human activities and ensuring their habitats are properly protected from human use and development. The Center has worked to protect the North Atlantic right whale from a range of anthropogenic threats by reviewing scientific data and agency information, petitioning NMFS for increased protections, filing litigation, and monitoring and commenting on activities that have the potential to harm right whales. The Center is a signatory to the 2012 and 2020 Petitions.

29.     The Center brings this action on behalf of itself and its members, many of whom enjoy studying, photographing, observing, and attempting to observe North Atlantic right

whales. The Center's members regularly engage in these activities in various locations along the Atlantic Coast from land and water and will continue to do so in the future.

30.     For example, one Center member has a home on Cape Cod Bay. Her home is located on the top of a hill above the Bay and she can watch whales from her living room window. She has seen many whales from this vantage; one particularly memorable spring, she viewed a large number of right whales together in the Bay, spouting water. She has also seen a female and baby right whale in the waters near her home. She plans to continue looking for and viewing right whales from her window and near her home in the future. Her interests are harmed by Defendants' failure to sufficiently safeguard the right whale. In fact, she often sees vessels from her windows in addition to right whales. She is aware of, and worried about, the risk of injury and death that these and other vessels pose to right whales.

31.     Plaintiffs' and their members' interests have been, are, and will be directly, adversely, and irreparably affected by Defendants' violations of law. Plaintiffs' members will continue to be harmed by Defendants' unlawful actions until and unless this Court provides the relief prayed for in this Complaint.

### Defendants

32.     Defendant National Marine Fisheries Service is a component agency of the Department of Commerce. It is sometimes referred to as NOAA Fisheries. NMFS is the agency to which the Secretary of Commerce has delegated the authority to conserve endangered and threatened marine species under the ESA and protect marine mammal species under the MMPA, including through promulgating protective rules.

33.     Defendant Wilbur Ross is the Secretary of Commerce and is sued in his official capacity. Secretary Ross directs all business of the Department of Commerce. The Secretary of

Commerce is ultimately responsible under federal law for ensuring that the actions and decisions of the Department and its component agencies, including NMFS, comply with all applicable laws and regulations, including the ESA and MMPA.

## STATUTORY FRAMEWORK

### Endangered Species Act

34.     In 1973, recognizing that certain species "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the ESA, 16 U.S.C. §§ 1531–1544, "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." *Id.* § 1531(a)(2), (b).

35.     The ESA protects imperiled species by listing them as "endangered" or "threatened." A species is endangered if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is threatened if it is "likely to become an endangered species in the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

36.     Considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," the ESA embodies the "plain intent" of Congress to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180, 184 (1978).

37.     The ESA defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3). The ESA's

goal is not simply to prevent endangered and threatened species from becoming extinct but to recover these species to the point where they no longer require the statute's protections.

38.     To that end, the ESA expresses that it is the "policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance" of the statute's purposes. 16 U.S.C. § 1531(c)(1). The ESA states that the Secretary [of Interior or Commerce][1] "shall review other programs administered by him and utilize such programs in furtherance" of the ESA's purposes, while "[a]ll other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities" to further the ESA's purposes "by carrying out programs for the conservation" of listed species. *Id.* § 1536(a)(1).

39.     The ESA requires the Secretary to develop and implement recovery plans "for the conservation and survival" of listed species. *Id.* § 1533(f)(1). Recovery plans must incorporate "a description of such site-specific management measures as may be necessary to achieve the plan's goal for the conservation and survival of the species. *Id.* § 1533(f)(1)(B)(i).

40.     The ESA prohibits the intentional or incidental take of an endangered species unless otherwise permitted. *Id.* § 1538(a)(1). The statute defines take to include engaging in, or attempting to engage in, conduct that will "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" an individual of an endangered species. *Id.* § 1532(19). NMFS defines "harm" by regulation to include "an act which actually kills or injures fish or wildlife." 50 C.F.R. § 222.102.

---

[1]     The Secretary of the Interior, through the U.S. Fish and Wildlife Service, administers the ESA for terrestrial species, freshwater fish, and a few species of marine mammals, while the Secretary of Commerce, through NMFS, administers the statute for most marine species, including right whales.

41.     The ESA authorizes the Secretary of Commerce to promulgate regulations as appropriate to enforce the statute. 16 U.S.C. § 1540(f).

**Marine Mammal Protection Act**

42.     In enacting the MMPA in 1972, 16 U.S.C. §§ 1361–1389, Congress declared that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic" and that it was Congress' sense "that they should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem." *Id.* § 1361(6).

43.     Congress recognized that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities." *Id.* § 1361(1). It determined that "such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part" and that "they should not be permitted to diminish below their optimum sustainable population." *Id.* § 1361(2). The statute defines "optimum sustainable population" to mean "the number of animals which will result in the maximum productivity of the population or species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent part." *Id.* § 1362(9).

44.     To achieve these goals, the MMPA establishes a "moratorium on the taking" of marine mammals. *Id.* § 1371(a). "Take" is broadly defined in the MMPA to mean "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13). The statute specifically prohibits (unless otherwise permitted) "any person subject to the jurisdiction of the United States or any vessel or other conveyance subject to the jurisdiction

13

of the United States to take any marine mammal on the high seas." *Id.* § 1372(a)(1). Similarly, it prohibits "any person or vessel or conveyance to take any marine mammal in waters or on lands under the jurisdiction of the United States." *Id.* § 1372(a)(2)(A). The statute prohibits both intentional and incidental take.

45.     In enacting the MMPA, Congress specifically recognized that the statute would provide a much-needed means for regulating vessels that harass, harm, or kill marine mammals. *See* 1972 H.R. Rep. No. 92-107 (1972) *reprinted in* 1972 U.S.S.C.A.N. 4144, 4147–50 (stating that "the operation of powerboats in areas where the manatees are found" pose a threat to that species and that, without the MMPA, "the Federal government is essentially powerless to force these boats to slow down or curtail their operations." The MMPA "would provide the Secretary of the Interior with adequate authority to regulate or even forbid the use of powerboats in waters where manatees are found.").

46.     The MMPA authorizes the Secretary of Commerce to prescribe such regulations as are necessary and appropriate to carry out the statute's purposes. 16 U.S.C. § 1382(a).

**Administrative Procedure Act**

47.     The APA establishes general rules governing the issuance of proposed and final regulations by federal agencies. 5 U.S.C. §§ 551–559. It defines a "rule making" to mean the "process for formulating, amending, or repealing a rule." *Id.* § 551(5). Absent narrow circumstances, a federal agency must publish a notice and allow public comment on any proposed "rule making." *Id.* § 553(b), (c).

48.     The statute establishes that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." *Id.* § 553(e). It also requires that, "within a reasonable time, each agency shall proceed to conclude a matter presented to it." *Id.* §

555(b). Further, the agency must give "prompt notice" of the "denial in whole or in part" of a written petition, together with a "brief statement of the grounds for denial." *Id.* § 555(e).

49.     The APA establishes judicial review provisions for agency actions that apply unless statutes preclude judicial review or the action is committed to agency discretion by law. 5 U.S.C. §§ 701–706. "Agency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). Under the APA's judicial review provision, the reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed[.]" *Id.* § 706(1).

50.     In this Circuit, courts consider several factors in determining whether an agency's delay is unreasonable, including: (1) "the length of time that has elapsed since the agency came under a duty to act," (2) "the context of the statute which authorizes the agency's action," (3) "the consequences of the agency's delay," and (4) "any plea of administrative effort, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001); *see also Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984).

## FACTS

### The North Atlantic Right Whale

51.     The North Atlantic right whale's current range primarily extends over the eastern seaboard of North America, from the coastal waters of Atlantic Canada to Florida. Right whales migrate seasonally. In the spring, summer, and fall, many right whales can be found in the colder waters off Atlantic Canada; they are now found year-round in Southern New England waters. In the fall and winter, pregnant female right whales may travel more than a thousand miles from

their cold-water feeding grounds to the shallow, warm coastal waters of the southeastern United States to birth and nurse their calves in the species' only known calving grounds.

52.     As the apocryphal tale is told, whalers gave the right whale its common name. They supposedly dubbed it the "right" whale to hunt because it is often found close to shore, swims relatively slowly, and is so blubber-rich that a healthy whale will usually float when killed.[2]

53.     Although this just-so story is just that, there is no doubt that whalers on both sides of the Atlantic enthusiastically pursued the right whale to the brink of extinction. Norse whalers hunted right whales as early as the ninth century. Beginning in the eleventh century, Basque whalers established a thriving European trade in right whale meat, pursuing their prey to the shores of Newfoundland by the sixteenth century. Centuries of whaling essentially extirpated the species from its eastern North Atlantic range.

54.     Yankee whalers came close to finishing the species off. Right whales (and other large whales) proved a rich source of oil, baleen, and other products on which the fortunes of an industrializing region were built. By the end of the nineteenth century, American whales had hunted the right whale to the point of commercial extinction in its western North Atlantic range.

---

[2]     *See, e.g.*, Jack Fritsch, "The Right Whale Whale…but Wrong Story," Nantucket Historical Association, https://nha.org/research/nantucket-history/history-topics/the-right-whalebut-wrong-story (accessed January 13, 2021).



*Currier & Ives, ca. 1856*
*"The Whale Fishery: Attacking a 'Right Whale'—and 'Cutting In'"*
*Library of Congress*

55.     In 1935, the 1931 Convention for the Regulation of Whaling prohibiting the killing of right whales entered into force. In the modern environmental law era, the right whale was first protected as an endangered species in 1970 under the predecessor statute to the ESA. It has been protected under the MMPA since that statute's enactment in 1972.

56.     Although vessels in U.S. waters are no longer used to hunt right whales deliberately, they are nevertheless still deadly to the species. The right whale's seasonal migration patterns take it into, or adjacent to, major shipping corridors on the East Coast, areas also heavily used by fishing, recreational, and other vessels.

57.     Right whales have raised patches of roughened skin on their heads, known as callosities. These callosities are found only on right whales and, like human fingerprints, have distinctive patterns that enable scientists to identify individual right whales. The callosities are

17

covered by barnacles and tiny crustaceans known as whale lice. The barnacles and whale lice make the callosities appear white or pale yellow and thus visible from vessels or airplanes undertaking visual surveys. Scientists at the New England Aquarium maintain an extensive catalog that documents each of the North Atlantic right whales known to exist.

**Vessel Strikes**

58.     The right whale has a dark body, lacks a dorsal fin, and often swims mere feet below the ocean's surface, making it difficult for modern mariners to detect and avoid. Right whales may surface abruptly to breathe, directly in the path of a ship. Right whales resting, foraging, or socializing on the surface may be oblivious to large ships approaching because of the so-called "bow null effect" that blocks engine noise by the bow, creating a quiet zone in front of the vessel.



*Florida Fish and Wildlife Conservation Commission*

59.     Vessel collisions kill or injure right whales by causing blunt force trauma resulting in fractures, hemorrhage, and/or blood clots. Direct propeller strikes can result in fatal blood loss, lacerations, and/or amputations.



*Monica Zani, New England Aquarium*

60.     Many living whales bear the scars of nonlethal collisions. Nonlethal collisions may weaken or otherwise adversely affect right whales such that they are more likely to become vulnerable to subsequent injury or death. In one grim example, a pregnant adult female right whale is believed to have died of infection when the propeller scars from a vessel strike she had survived as a calf split open as her pregnancy advanced.

61.     Vessels of various sizes can injure or kill right whales. Research on known vessel strike mortalities in both right whales and other large whale species has demonstrated that vessel speed is a principal factor in the likely lethality of a strike. A comprehensive review of 27 years of data on vessel strikes on large whales showed that the higher the vessel speed, the greater the probability of death or serious injury to the whale.

19

62.     Vessel strikes have long been recognized as a primary threat to the right whale's survival and recovery. In the two decades between 1986 and 2006, for example, vessel strikes averaged around one mortality each year with 19 known deaths. Similarly, of the more than 50 confirmed right whale deaths detected from 1990 to 2008, more than half—56 percent—were attributed to vessel strikes. From 2017 to 2020, out of the 18 of 32 dead stranded right whales whose bodies could be examined, 11 right whales—60 percent—were determined or suspected to have been killed by vessel strikes. Additionally, NMFS made a serious injury determination for the calf struck in January 2020.

63.     NMFS's most recent revision to the species' recovery plan in 2005 identified reducing or eliminating vessel strike injuries and deaths as among its highest priorities, stating that the development and implementation of an effective strategy to address this threat is essential to the species' recovery.

64.     Pregnant females and mothers with nursing calves spend more time at the surface than males, rendering them uniquely vulnerable to vessel strikes. Young whales (calves to juveniles) and females are disproportionately affected by vessel strikes compared to adult males, as evidenced by the death and serious injury of two out of the season's ten calves in 2020 from vessel strikes.

**2008 Vessel Speed Rule**

65.     The road to regulating vessel speed in U.S. waters was a long one. In May 1999, NMFS initiated a series of stakeholder meetings along the eastern seaboard to discuss ways to reduce vessel strikes. 71 Fed. Reg. 36,299, 36,301 (June 26, 2006). In 2001, NMFS commissioned a report based on these stakeholder meetings on recommended vessel strike reduction management measures and used that report as a baseline to develop a strategy

consisting of research, developing regulations, and taking international actions. 69 Fed. Reg. 30,

857 (June 1, 2004).

66.     In 2004, NMFS finally initiated rulemaking under the ESA and MMPA via an

advance notice of proposed rulemaking. *Id.* The agency issued its proposed rule two years later.

71 Fed. Reg. at 36,299. The rulemaking culminated in 2008 in the Final Rule to Implement

Speed Restrictions to Reduce the Threat of Ship Collisions With North Atlantic Right Whales

("Vessel Speed Rule"). 73 Fed. Reg. 60,173 (Oct. 10, 2008) (codified at 50 C.F.R. § 224.105).

67.     The Vessel Speed Rule establishes a speed restriction on non-sovereign vessels of

65 feet in length of no more than ten nautical miles per hour ("knots"). NMFS established this

speed limit based on scientific research correlating vessel speed with the occurrence and severity

of vessel collisions on large whales. The impact forces of a collision increase with increasing

vessel speed. The probability of a vessel collision causing the death or serious injury of a large

whale increases as vessel speed increases. Higher vessel speeds may also increase the probability

of a vessel strike occurring.

68.     The Rule establishes three separate Seasonal Management Areas ("SMAs") in

which the mandatory speed limit applies during specified times of the year. NMFS designated

these areas based on data on right whale movement, distribution, and aggregation patterns during

migration, feeding, and nursery activities developed over several decades of observation of the

species' temporally and spatially predictable movements as well as existing vessel traffic

patterns.

69.     In the Northeast, the Rule applies in Cape Cod Bay from January 1 through May

15; in an area identified as "Off Race Point" from March 1 through April 30; and in the Great

South Channel from April 1 to July 31 to help reduce risk in the late winter and spring when right whales forage and socialize in these areas. 50 C.F.R. § 224.105(a)(3).

70.     In the Mid-Atlantic, the Rule applies from November 1 through April 30 in parts of Block Island Sound; within a 20 nautical mile radius of the Ports of New York/New Jersey, Entrance to the Delaware Bay, Entrance to the Chesapeake Bay, and Ports of Morehead City and Beaufort, North Carolina; and out to 20 nautical miles along a contiguous strip between Wilmington, North Carolina and Brunswick, Georgia to help reduce risk in the right whale's migratory corridor. *Id.* § 224.105(a)(2).

71.     In the Southeast, the Rule applies in the core right whale calving area from November 15 through April 15 to reduce risk where female whales birth and nurse their calves in the warm, shallow, relatively benign waters off Georgia and Florida. *Id.* § 224.105(a)(1).

72.     The Vessel Speed Rule establishes an exemption to the mandatory speed restrictions in SMAs for situations in which oceanographic, hydrographic, or meteorological conditions necessitate traveling more than ten knots to maintain safe maneuvering speed, as attested in a vessel's logbook by the master. *Id.* § 224.105(c).

73.     The Rule also establishes a program of voluntary slow speeds in designated Dynamic Management Areas ("DMAs"). Under this program, NMFS establishes a DMA with a radius of at least three nautical miles upon the sighting of an aggregation of three or more right whales in an area not already encompassed by an SMA. 73 Fed. Reg. at 60,180. A DMA is temporary, lasting for 15 days with a potential 15-day extension if right whales are resighted in the same area. Mariners are asked, but not required, to avoid the DMA altogether or to travel through it at no more than ten knots. *Id.*

74.     The Vessel Speed Rule went into effect on December 9, 2008. However, NMFS added a five-year sunset provision to the final rule. *Id.* at 60,173.

### 2012 Petition to Expand the Vessel Speed Rule

75.     In February 2012, NMFS published a technical memorandum assessing the results of the Vessel Speed Rule. This assessment concluded that "the justification and reasoning for establishing vessel speed restrictions still stand" and that these justifications, in addition to new information obtained since the Rule's promulgation, "strongly suggest that the use of vessel speed restrictions should continue."

76.     On June 28, 2012, Plaintiffs Center for Biological Diversity, Defenders of Wildlife, and Whale and Dolphin Conservation (then Whale and Dolphin Conservation Society) submitted a petition to Defendants titled "Petition for Rulemaking to Prevent Deaths and Injuries of Critically Endangered North Atlantic Right Whales from Ship Strikes" pursuant to the APA, 5 U.S.C. § 553(e). This petition contained specific requests to extend and improve the conservation effectiveness of the Vessel Speed Rule.

77.     The 2012 Petition requested NMFS to expand the Vessel Speed Rule to make it more protective, including by expanding SMAs to encompass certain areas where the agency had repeatedly identified DMAs, i.e., areas where aggregations of three or more right whales had regularly and repeatedly been detected.

78.     It further requested NMFS to make compliance with DMAs mandatory, rather than voluntary, based on the agency's own data and analysis demonstrating a marked lack of mariner adherence to voluntary speed limits.

79.     It requested NMFS to extend the SMAs in the mid-Atlantic from 20 nautical miles out to 30 nautical miles from shore, based on the scientific literature demonstrating how close to the coastline right whales are commonly found.

80.     It requested NMFS to combine two SMAs, "Off Race Point" at the entrance to Cape Cod Bay and Cape Cod Bay itself, into a single SMA that would provide protection from January 1 to April 30, a season when right whales typically use Cape Cod Bay in high densities.

81.     It requested NMFS to consider applying the Vessel Speed Rule to vessels shorter than 65 feet in length on a voluntary basis given the demonstrated risks not only to right whales but also to vessels and their passengers from collisions.

82.     Finally, it requested NMFS to extend the Vessel Speed Rule indefinitely (i.e., eliminate the sunset provision and make the regulation permanent).

### 2013 Rule Eliminating the Sunset Provision

83.     In 2013, NMFS published a proposed rule to eliminate the sunset provision. 78 Fed. Reg. 34,024 (June 6, 2013). The proposed rule cited published studies showing that "the probability of lethal strikes [has] been diminished substantially as a result of the rule" and that "there have been no vessel-strike related right whale deaths in the areas covered by the vessel speed restriction rule [i.e., SMAs] since its implementation." *Id.* at 34,026; *see also id.* at 34,027 (citing additional studies on the benefits of speed restrictions to protect other marine mammals and sea turtles). It also cited a study NMFS commissioned demonstrating that the "economic impacts of the rule are substantially lower than were initially projected in 2008." *Id.* at 34,026.

84.     This proposed rule did not acknowledge or respond to the 2012 Petition.

85.     On August 5, 2013, the 2012 Petitioners submitted a comment letter on this proposed rule. This letter explicitly referenced the 2012 Petition and reiterated the substantive

requests therein, including not only eliminating the sunset provision but also expanding the Vessel Speed Rule in specific ways.

86.     On December 9, 2013, NMFS published a final rule eliminating the sunset provision, but maintaining all other aspects of the Vessel Speed Rule without change. 78 Fed. Reg. 73,726.

87.     The final rule stated NMFS's intention to synthesize, review, and issue a report for public comment within five years on studies and information on the effectiveness of the Vessel Speed Rule in reducing ship strike-caused right whale deaths as well as on mariner response to and economic impacts of the rule. *Id.* at 73,734–35.

88.     This final rule also did not acknowledge or respond to the 2012 Petition.

**2014–2015 American Pilots' Association "Petition"**

89.     During the comment period on the June 6, 2013 proposed rule, NMFS received a three-page comment letter from the American Pilots' Association recommending that the agency exclude federally-maintained dredged entrance channels and pilot boarding areas from New York, NY to Jacksonville, FL from the restrictions of the Vessel Speed Rule. The final rule eliminating the sunset provision responded to this and similar comments. *Id.* at 73,731.

90.     In the final rule, NMFS stated its intent to treat the American Pilots' Association's comment as a petition for rulemaking under the APA and to publish a notice in the Federal Register announcing receipt of this "petition" and seeking public comment. *Id*. NMFS published this notice and request for comments in January 2014. 79 Fed. Reg. 4883 (January 30, 2014).

91.     On March 3, 2014, the 2012 Petitioners submitted a comment letter opposing any exemptions from the Vessel Speed Rule, emphasizing in particular that the Rule's existing navigational safety exemption is sufficient to allow any necessary deviations from applicable

speed restrictions to assure safe navigation in challenging conditions based on the professional judgment of vessel masters or pilots. This comment letter explicitly noted that NMFS had failed to respond to the detailed 2012 Petition requesting expansions of the Rule.

92.     In October 2015, NMFS published its finding that the American Pilots' Association's "petition" did not present substantial information indicating that excluding federally-maintained dredged channels and pilot boarding areas from the restrictions of the Vessel Speed Rule is necessary to address the safety concerns expressed by the Association. 80 Fed. Reg. 62,008 (Oct. 15, 2015).

### 2017–Present: Unusual Mortality Event

93.     Because of its shape, shallow depth, and location at the convergence of the opposing Labrador Current and Gulf Stream, the Gulf of Maine is a hotspot for ocean warming. In fact, it has warmed faster than 99 percent of the global oceans.

94.     This warming has had significant deleterious consequences for the North Atlantic right whale. The right whale is a specialist, not a generalist feeder. It forages on dense aggregations of copepods, tiny zooplankton that it filters out by straining enormous volumes of ocean water through its baleen plates. The right whale's preferred copepod prey species are cold-water dependent. As the Gulf of Maine has warmed, copepod distributions have shifted north, disrupting the right whale's historic migration patterns. This has led right whales to spend more time in areas with fewer or no protections from vessel strikes and fishing gear entanglements.

95.     In addition to the population decline from 2010 to the present and the Unusual Mortality Event that began in 2017 described above, calving rates have also been low in recent years. In the three calving seasons from 2017 to 2019, only 22 right whale births were recorded, about one-third the average annual birth rate. As of today, in the 2020 calving season, the nine

live calves that have observed in the southeastern U.S. bring that number to 31. Calves do not replace adults that have been killed one to one. Unlike adult right whales, calves suffer both human-caused and natural mortalities due to issues including, but not limited to, birth complications and mother-calf separation.

96. Vessel strikes continue to kill, seriously injure, and take right whales within their U.S. range. Since 2013, when the Rule was made permanent, at least 12 right whale-vessel collisions have been documented in U.S. waters. NMFS has determined that four of those collisions resulted in mortalities or serious injuries. Given that 40 to 60 percent of right whale mortalities are not observed, it is entirely possible that the true number of mortalities and serious injuries resulting from vessel collisions in U.S. waters since 2013 is higher.

97. Consistent with the pattern of vessel strikes disproportionately affecting young right whales and adult females, of the 12 known right whale-vessel collisions since 2013, six were calves, four were subadults, and one of the two adults was female while the other was of unknown gender.

98. Of the ten calves born in the last calving season, two were killed or seriously injured in 2020 in U.S. waters as a result of vessel strikes.

99. On January 8, 2020, a newborn calf was discovered seriously injured very shortly after birth by a vessel off the coast of Georgia. The calf suffered propeller wounds across the top of its head and through its mouth. Its prognosis for survival was determined to be poor. It has not been resighted since January 16, 2020.

100. A second calf was found dead on June 25, 2020, off the coast of New Jersey. An examination of its carcass showed that it had been struck by two different vessels. The first strike

grievously wounded the calf and would likely eventually have caused its death. The second strike likely killed it outright.

101.    Because right whale mothers and calves stay close together, it is possible that the mothers of these two calves were also struck by the same vessels. Derecha, the mother of the newborn calf struck in January 2020, has not been resighted since.

## 2020 Petition to Expand the Vessel Speed Rule

102.    Although the Vessel Speed Rule has ameliorated the risk of vessel strikes within SMAs, the risk of vessel strikes has increased outside SMAs. Nor are voluntary DMAs adequately protective. The data show that compliance with these voluntary restrictions is low. For example, NMFS's 2017 Right Whale Status Report noted "that compliance with the voluntary speed restrictions within DMAs was poor." A 2019 case study conducted by agency scientists of DMAs in place from November 2018 through April 2019 off New York found a "lack of detectable change in ships' speed despite direct communication to operators," leading the scientists to conclude "that conservation measures without consequence were not effective."

103.    Similarly, a 2020 report by Oceana demonstrated that more than 41 percent of 446 vessels in a DMA south of Nantucket exceeded the voluntary speed restriction. Most of these vessels were large cargo and tanker ships. The same report found that by contrast 88.4 percent of ships transiting through the nearby Block Island SMA were in compliance with the mandatory speed restriction.

104.    As shown by the data on vessel-right whale collisions in U.S. waters since 2013, the Rule is inadequate to reduce the risks of vessel strikes sufficiently to prevent further declines in this critically imperiled species.

105.    On August 6, 2020, Plaintiffs submitted a petition to Defendants titled "Petition for Rulemaking to Prevent Deaths and Injuries of Critically Endangered North Atlantic Right Whales from Vessel Strikes," pursuant to 5 U.S.C. § 553(e). The 2020 Petition requested that NMFS utilize its rulemaking authorities under the ESA and the MMPA to amend the Vessel Speed Rule to reduce the risk of vessel strikes to North Atlantic right whales and promote the conservation and recovery of this species as required by law.

106.    Specifically, the 2020 Petition requested that NMFS:

a.  extend vessel speed restrictions to vessels under 65 feet (19.8 meters);

b.  require mandatory vessel speed restrictions in all Dynamic Management Areas, and strengthen the trigger for Dynamic Management Areas to include any sighting of a cow/calf pair;

c.  expand the Seasonal Management Area outside the ports of New York and New Jersey to 40 nautical miles, effective year-round, with dynamic vessel speed restrictions in areas of designated Traffic Separation Schemes;

d.  expand the Block Island Seasonal Management Area to the east, and make the Seasonal Management Area effective year-round;

e.  expand the Seasonal Management Area off Virginia out to 45 nautical miles;

f.  expand all other Mid-Atlantic and Southeast Seasonal Management Areas out to 30 nautical miles;

g.  combine the Off Race Point and Cape Cod Bay Seasonal Management Areas into a single management area effective January 1 through May 15; and

h.  maintain all other vessel speed restrictions not specifically revised as requested to prevent further mortality and injury resulting from incidental vessel strikes.

107.    The 2020 Petition requested NMFS to extend the current vessel speed restrictions to vessels under 65 feet in length and to consider exactly what vessel length below 65 feet is an appropriate lower bound. Of the 12 known right whale-vessel collisions in U.S. waters since 2013, at least eight of the vessels involved were confirmed or suspected to have been under 65 feet in length. NMFS's own Large Whale Ship Strike Database reflects that, in at least half the

cases where a vessel known to have been shorter than 65 feet struck a whale, blood was seen in the water.

108.    The 2020 Petition requested NMFS to make compliance with DMAs mandatory based on extensive evidence that voluntary DMAs have been ineffective at persuading mariners to reduce their speeds. Moreover, given that the current trigger for a DMA is an aggregation of three or more right whales, but that sightings of vulnerable mother-calf pairs do not trigger DMAs, the 2020 Petition requested that the DMA trigger be revised to include any sighting of a mother-calf pair.

109.    The 2020 Petition further requested expansions of existing SMAs in both time and space to reflect the reality that because right whales have shifted their geographic range and seasonal distribution due to climate change, existing SMAs are inadequate to address the risks of vessel strikes in times and areas where right whales and vessel traffic are most likely to overlap.

110.    NMFS has not acknowledged or responded to the 2020 Petition.

### FIRST CLAIM FOR RELIEF

### Unreasonable Delay–2012 Petition

111.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1–110.

112.    The APA states that each federal agency "shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

113.    Under the APA, each federal agency "shall proceed to conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). More than eight and a half years have elapsed since June 28, 2012 when Plaintiffs sent the 2012 Petition to Defendants. By failing to act on the 2012 Petition, Defendants are in violation of this provision.

114.     Under the APA, each federal agency must give "prompt notice" of the denial in whole or in part of a petition and must provide a "brief statement of the grounds for denial" with that notice. *Id.* § 555(e). By failing to act on the 2012 Petition, Defendants are in violation of this provision.

115.     Defendants' failure to act on the 2012 Petition constitutes agency action unreasonably delayed within the meaning of the APA, 5 U.S.C. § 706(1).

116.     The APA authorizes this Court to "compel agency action . . . unreasonably delayed." *Id.*

117.     Plaintiffs and their members are harmed and will continue to be harmed by Defendants' unlawful unreasonable delay in acting on the 2012 Petition. Granting Plaintiffs' requested relief will remedy these harms.

**SECOND CLAIM FOR RELIEF**

**Unreasonable Delay–2020 Petition**

118.     Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1–110.

119.     The APA states that each federal agency "shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

120.     Under the APA, each federal agency "shall proceed to conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). More than five months have elapsed since August 6, 2020, when Plaintiffs sent the 2020 Petition to Defendants. By failing to act on the 2020 Petition, Defendants are in violation of this provision.

121.     Under the APA, each federal agency must give "prompt notice" of the denial in whole or in part of a petition and must provide a "brief statement of the grounds for denial" with

that notice. *Id.* § 555(e). By failing to act on the 2020 Petition, Defendants are in violation of this provision.

122.    Defendants' failure to act on the 2020 Petition constitutes agency action unreasonably delayed within the meaning of the APA, 5 U.S.C. § 706(1).

123.    The APA authorizes this Court to "compel agency action . . . unreasonably delayed." 5 U.S.C. § 706(1).

124.    Plaintiffs and their members are harmed and will continue to be harmed by Defendants' unreasonable delay in responding to the 2020 Petition. Granting Plaintiffs' requested relief will remedy these harms.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)    Declare that Defendants' ongoing failure to act on the 2012 Petition constitutes agency action unreasonably delayed in violation of the APA;

(2)    Declare that Defendants' ongoing failure to act on the 2020 Petition constitutes agency action unreasonably delayed in violation of the APA;

(3)    Enter an order enjoining Defendants from further delay in responding substantively to the 2012 Petition and requiring a response to the 2012 Petition within 60 days;

(4)    Enter an order enjoining Defendants from further delay in responding substantively to the 2020 Petition and requiring a response to the 2020 Petition within 60 days;

(5)    Award Plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(6)     Grant any other relief this Court finds just and proper.

Respectfully submitted this 13th day of January, 2021.

/s/ *Jane P. Davenport*
Jane P. Davenport (DC Bar No. 474585)
DEFENDERS OF WILDLIFE
1130 17th St NW
Washington, DC 20036
(202) 682-9400 x174 (tel)
jdavenport@defenders.org

/s/ *Erica A. Fuller*
Erica A. Fuller (DC Bar No. MA0001)
CONSERVATION LAW FOUNDATION
62 Summer St
Boston, MA 02110
(617) 850-1727 (tel)
efuller@clf.org

/s/ *Kristen Monsell*
Kristen Monsell (DC Bar No. CA00060)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Ste. 800
Oakland, CA 94612
(510) 844-7137 (tel)
kmonsell@biologicaldiversity.org

*Attorneys for Plaintiffs*

33