## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| WHALE AND DOLPHIN CONSERVATION; DEFENDERS OF WILDLIFE; CONSERVATION LAW FOUNDATION; CENTER FOR BIOLOGICAL DIVERSITY, | Civ. No. 1:21-cv-00112-APM |
| *Plaintiffs*, | **ORAL ARGUMENT REQUESTED** |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE; GINA RAIMONDO, in her official capacity as Secretary of Commerce, | |
| *Defendants.* | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a) and Local Civil Rule 7(h), Plaintiffs Whale and Dolphin Conservation, Defenders of Wildlife, Conservation Law Foundation, and Center for Biological Diversity (collectively, "Plaintiffs") hereby move for summary judgment.

Defendants have unreasonably delayed taking final action on Plaintiffs' August 2020 rulemaking petition to expand the Final Rule to Implement Speed Restrictions to Reduce the Threat of Ship Collisions With North Atlantic Right Whales, 73 Fed. Reg. 60,173 (Oct. 10, 2008) (codified at 50 C.F.R. § 224.105), in violation of the Administrative Procedure Act, 5 U.S.C. §§ 555(b), 706(1).

Plaintiffs have standing to challenge Defendants' inaction. This Court has subject matter jurisdiction over Plaintiffs' claim pursuant to 28 U.S.C. § 1331 because Plaintiffs' civil claim asserts a federal question arising under the Administrative Procedure Act.

Summary judgment is warranted because "there is no genuine dispute as to any

material fact" and, as described in the Memorandum in Support of this Motion included below

pursuant to Local Civil Rule 7(a), Plaintiffs "are entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). As required by Local Civil

Rule 7(h)(1), Plaintiffs attach a Statement of Undisputed Material Facts.

The Court should grant Plaintiffs' motion for summary judgment and order declaratory

and other relief as described in the Memorandum and in the Proposed Order submitted pursuant

to Local Civil Rule 7(c).

Respectfully submitted this 4th day of February, 2022,

/s/ *Kristen Monsell*
Kristen Monsell, DC Bar No. CA00060
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Ste. 800
Oakland, CA 94612
(510) 844-7137 (tel)
kmonsell@biologicaldiversity.org

/s/ *Jane P. Davenport*
Jane P. Davenport, DC Bar No. 474585
DEFENDERS OF WILDLIFE
1130 17th St NW
Washington, DC 20036
(202) 682-9400 x174 (tel)
jdavenport@defenders.org

/s/ *Erica A. Fuller*
Erica A. Fuller, DC Bar No. MA0001
CONSERVATION LAW FOUNDATION
62 Summer St
Boston, MA 02110
(617) 850-1727 (tel)
efuller@clf.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| WHALE AND DOLPHIN CONSERVATION; DEFENDERS OF WILDLIFE; CONSERVATION LAW FOUNDATION; CENTER FOR BIOLOGICAL DIVERSITY, | Civ. No. 1:21-cv-00112-APM |
| | **ORAL ARGUMENT REQUESTED** |
| *Plaintiffs*, | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE; GINA RAIMONDO, in her official capacity as Secretary of Commerce, | |
| *Defendants*. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................iii

INTRODUCTION .............................................................................................1

STATUTORY FRAMEWORK..............................................................................2

I.      Endangered Species Act ..................................................................2

II.     Marine Mammal Protection Act .......................................................4

III.    Administrative Procedure Act...........................................................6

FACTUAL BACKGROUND...............................................................................7

I.      Vessel Strikes Are an Existential Threat to the Critically Endangered
        Right Whale .......................................................................................7

II.     NMFS's 2008 Vessel Speed Rule and Plaintiffs' Rulemaking Petitions .................11

        A.      1999–2008: NMFS's Nearly Decade-Long Rulemaking, Two Petitions,
                and Two Lawsuits ...............................................................11

        B.      2008–2003: Vessel Speed Rule, Plaintiffs' 2012 Petition, and
                Rulemaking to Eliminate Five-Year Sunset Clause......................................12

        C.      2013–2020: Continuing Vessel Strikes, Unusual Mortality Event, and
                Plaintiffs' 2020 Petition ......................................................15

        D.      2021–present: More Vessel Strikes and Vessel Speed Rule
                Assessment Report....................................................................17

STANDING .....................................................................................................19

SCOPE AND STANDARD OF REVIEW ...........................................................22

ARGUMENT...................................................................................................24

I.      NMFS'S 18-Month (and Counting) Delay on the 2020 Petition is Unreasonable ....24

II.     The Agency's Delay Undermines Congress' Intent in Enacting the MMPA
        and ESA ............................................................................................26

III.    The Consequences of Delay Are Severe Because the Right Whale is Spiraling
        Toward Extinction ............................................................................28

IV.     Conserving the Critically Endangered Right Whale Is and Must Be
        an Agency Priority .................................................................................................29

REMEDY.................................................................................................................................30

CONCLUSION.........................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Oil & Gas Ass'n v. Jewell*,
815 F.3d 544 (9th Cir. 2016) ...................................................................27

*\*In re Am. Rivers & Idaho Rivers United*,
372 F.3d 413 (D.C. Cir. 2004) ....................................................... *passim*

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
515 U.S. 687 (1995) ..................................................................................27

*\*Biodiversity Legal Found. v. Norton*,
285 F. Supp. 2d 1 (D.D.C. 2003) ...............................................25, 27, 30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..................................................................................22

*\*Cobell v. Norton*,
240 F.3d 1081 (D.C. Cir. 2001) ..................................................... *passim*

*In re Core Commc'ns, Inc.*,
531 F.3d 849 (D.C. Cir. 2008) ..................................................................28

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017) ..................................................................21

*Ctr. for Biological Diversity v. Evans*,
No. C 04-04496 WHA, 2005 WL 1514102 (N.D. Cal. June 14, 2005)................................26

*Ctr. for Biological Diversity v. Kempthorne*,
607 F. Supp. 2d 1078 (D. Ariz. 2009) .......................................................4

*\*Cutler v. Hayes*,
818 F.2d 879 (D.C. Cir. 1987) ....................................................... *passim*

*Defenders of Wildlife v. Gutierrez*,
484 F. Supp. 2d 44 (D.D.C. 2007), *aff'd in part and rev'd in part*, 532 F.3d
913 (D.C. Cir. 2008) ..................................................................................12

*Defenders of Wildlife v. Gutierrez*,
No. 1:08-cv-01107-PLF (D.D.C. June 26, 2008) ......................................12

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aero. Workers Local Lodge 207
v. Raimondo*,
18 F.4th 38 (1st Cir. 2021) .........................................................................28

*Earth Island Inst. v. Brown*,
 865 F. Supp. 1364 (N.D. Cal. 1994) ........................................................................27

*Forest Guardians v. Babbitt*,
 174 F.3d 1178 (10th Cir. 1999) ...............................................................................23

*Forest Guardians v. Johanns*,
 450 F.3d 455 (9th Cir. 2006) ....................................................................................31

*Friends of the Clearwater v. Dombeck*,
 222 F.3d 552 (9th Cir. 2000) ....................................................................................23

*Friends of the Earth v. Laidlaw Envtl. Servs.*,
 528 U.S. 167 (2000).................................................................................................19

*Gona v. U.S. Citizenship & Immigration Servs.*,
 No. 1:20-cv-3680-RCL, 2021 WL 1226748 (D.D.C. Apr. 1, 2021) ......................23

*Hunt v. Wash. State Apple Advert. Comm'n*,
 432 U.S. 333 (1977).................................................................................................21

*In re Int'l Chem. Workers Union*,
 958 F. 2d 1144 (D.C. Cir. 1992) .........................................................................23, 24

*Kokechik Fishermen's Ass'n v. Sec'y of Comm.*,
 839 F.2d 795 (D.C. Cir. 1988) ...................................................................................4

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)............................................................................................19, 20

*Massachusetts v. EPA*,
 504 U.S. 497 (2007)............................................................................................19, 20

*Midwest Gas Users Ass'n v. FERC*,
 833 F.2d 341 (D.C. Cir. 1987) .................................................................................24

*Nader v. FCC*,
 520 F.2d 182 (D.C. Cir. 1975) .................................................................................22

*Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*,
 842 F. Supp. 2d 127 (D.D.C. 2012) .........................................................................22

*Pub. Citizen Health Research Grp. v. Brock*,
 823 F.2d 626 (D.C. Cir. 1987) .................................................................................25

*Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*,
 724 F. Supp. 1013 (D.D.C. 1989) ............................................................................31

*In re Public Emples.*,
  957 F.3d 267 (D.C. Cir. 2020) ............................................................................24

*\*Telecomm. Research & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ...................................................................... *passim*

*Tennessee Valley Authority v. Hill*,
  437 U.S. 153 (1978) ................................................................................2, 3, 27

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) .......................................................................20, 21

**Statutes**

<u>Administrative Procedure Act</u>

5 U.S.C. §§ 551–559 ......................................................................................6

5 U.S.C. § 555(b) .....................................................................................6, 22

5 U.S.C. § 555(e) .....................................................................................6, 31

5 U.S.C. §§ 701–706 ......................................................................................6

<u>Marine Mammal Protection Act</u>

16 U.S.C. §§ 1361–1389 ....................................................................................4

16 U.S.C. § 1361(1) ........................................................................................4

16 U.S.C. § 1361(1) .......................................................................................26

16 U.S.C. § 1361(6) .......................................................................................26

16 U.S.C. § 1361(2) .....................................................................................4, 27

16 U.S.C. § 1361(6) .....................................................................................4, 29

16 U.S.C. § 1362(20) ......................................................................................11

16 U.S.C. § 1382(a) ........................................................................................5

16 U.S.C. §§ 1401–02 .....................................................................................18

<u>Endangered Species Act</u>

16 U.S.C. §§ 1531–1544 ....................................................................................2

16 U.S.C. § 1531(b) .......................................................................................27

16 U.S.C. § 1531(b), (c) ...................................................................................................27

16 U.S.C. § 1532(3) ......................................................................................................3, 27

16 U.S.C. § 1532(19) ..........................................................................................................3

16 U.S.C. § 1533(f)(1) ........................................................................................................4

16 U.S.C. § 1538(a)(1)(B) ..................................................................................................3

16 U.S.C. § 1538(a)(1)(C) ..................................................................................................3

16 U.S.C. § 1540(f) .............................................................................................................4

**Other Authorities**

50 C.F.R. § 216.3 ................................................................................................................5

50 C.F.R. § 222.102 ............................................................................................................3

50 C.F.R. § 224.105(a) ......................................................................................................13

50 C.F.R. § 224.105(a) ......................................................................................................13

50 C.F.R. § 224.105(a)(1) .................................................................................................13

50 C.F.R. § 224.105(a)(2) .................................................................................................13

50 C.F.R. § 224.105(a)(3) .................................................................................................13

50 C.F.R. § 224.105(d) ................................................................................................15, 17

50 C.F.R. § 229.2 ............................................................................................................5, 7

69 Fed. Reg. 30,857 (June 1, 2004) ..................................................................................11

70 Fed. Reg. 56,884 (Sept. 29, 2005) ...............................................................................11

71 Fed. Reg. 36,299 (June 26, 2006) ...........................................................................11, 12

73 Fed. Reg. 60,173 (Oct. 10, 2008)......................................................................9, 10, 13, 15

78 Fed. Reg. 34,024 (June 6, 2013) ..................................................................................14

78 Fed. Reg. 73,726 (Dec. 9, 2013) ............................................................................14, 17

Fed. R. Civ. P. 56(a) .........................................................................................................22

H.R. Rep. No. 92-107 (1972), *reprinted in* 1972 U.S.S.C.A.N. 4144 ...................5, 6, 27

**INTRODUCTION**

North Atlantic right whales face two primary threats to their existence—fishing gear entanglements and vessel strikes. In the last decade, the right whale population has plummeted from a peak of 481 individuals in 2011 to an estimated *336 surviving animals* in January 2020. The National Marine Fisheries Service (NMFS) has determined that even one death a year risks the species' very survival.

Yet right whales are struck, injured, and killed by vessels each year. After years of delay and multiple rounds of litigation, NMFS promulgated a rule in 2008 to provide limited protections for right whales in certain areas at certain times of year (called Seasonal Management Areas) by setting mandatory speed limits for vessels 65 feet and longer ("2008 Vessel Speed Rule"). The rule also established temporary speed limit areas (called Dynamic Management Areas) triggered by the detection of an aggregation of three or more whales. Compliance with speed limits in these dynamic areas is strictly voluntary.

Since 2008, NMFS has failed to take a single concrete step to expand the rule's mandatory measures despite a rapidly declining whale population, multiple right whales injured or killed by vessels outside Seasonal Management Areas, repeated vessel strikes of mother-calf pairs, and substantial data demonstrating that vessels under 65 feet in length also kill whales.

Although NMFS has repeatedly recognized the right whale's dire status and has acknowledged that the 2008 Vessel Speed Rule does not sufficiently protect the species, the agency failed to enact new measures or take final action on Plaintiffs' 2012 and 2020 petitions urging it to expand the rule. In January 2021, Plaintiffs filed this case under section 706(1) of the Administrative Procedure Act, 5 U.S.C. § 706(1), challenging NMFS's unreasonable delay.

After more than eight and a half years of radio silence, NMFS took exactly one action in response to the 2012 Petition. Two months after Plaintiffs filed suit, the agency denied it by letter of March 8, 2021. As this Court ruled, this mooted Plaintiffs' First Claim. Mem. Op. and Order, ECF No. 14 at 7. However, as the Court also ruled, this letter did not moot Plaintiffs' Second Claim challenging NMFS's unreasonable delay in acting on the 2020 Petition. That petition has been pending for nearly 18 months as of today's date with no final response.

This delay is patently unreasonable. By dragging its feet, NMFS is undermining the purposes of the Endangered Species Act and Marine Mammal Protection Act by failing to fulfill its statutory duties to protect and recover the right whale. NMFS's delay has had real-world consequences. Six months after the August 2020 Petition and one month after Plaintiffs filed suit, in February 2021, a vessel strike in the southeast calving grounds off St. Augustine, Florida, mortally wounded a first-time right whale mother and killed her month-old calf outright— pushing the species closer to extinction.

Plaintiffs now move for summary judgment and ask this Court to enter an order requiring NMFS to take final action on the 2020 Petition by a date certain.

## STATUTORY FRAMEWORK

### I.    Endangered Species Act

In 1973, recognizing that certain species "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1544, "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species." *Id.* § 1531(a)(2), (b). Considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *Tennessee*

2

*Valley Authority v. Hill*, 437 U.S. 153, 176 (1978), the ESA embodies Congress' "plain intent" to "halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

The ESA defines conservation as "to use and the use of all methods and procedures which are necessary to bring any [listed species] to the point at which the measures provided pursuant to [the statute] are no longer necessary." 16 U.S.C. § 1532(3). The ESA's explicit goal is not simply to prevent endangered and threatened species from becoming extinct but to recover them to the point where they no longer require the statute's protections.

To that end, the ESA expresses that it is the "policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance" of the statute's purposes. *Id.* § 1531(c)(1). The ESA directs that the Secretary of Interior or Commerce[1] "shall review other programs administered by him and utilize such programs in furtherance" of the statute's purposes, while "[a]ll other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities" to further these purposes "by carrying out programs for the conservation" of listed species. *Id.* § 1536(a)(1).

The ESA generally prohibits any person, including federal agencies, from "tak[ing]" any individual member of an endangered species, 16 U.S.C. § 1538(a)(1)(B), (C), or to cause others to violate the take prohibition. *Id.* § 1538(g). "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19); *see also* 50 C.F.R. § 222.102 (NMFS regulatory definition of "harm").

---

[1] The Secretary of the Interior, through the U.S. Fish and Wildlife Service, administers the ESA for terrestrial species, freshwater fish, and a few species of marine mammals, while the Secretary of Commerce, through NMFS, administers the statute for most marine species, including right whales.

The ESA also requires the Secretary to develop and implement recovery plans for listed species. 16 U.S.C. § 1533(f)(1). These plans provide the "basic road map to recovery, i.e., the process that stops or reverses the decline of a species and neutralizes threats to its existence." *Ctr. for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1088 (D. Ariz. 2009).

The ESA authorizes the Secretary to promulgate regulations as appropriate to enforce the statute. 16 U.S.C. § 1540(f). It is unlawful for any person to violate any such regulation pertaining to a listed species. *Id.* § 1538(a)(1)(G).

## II.    Marine Mammal Protection Act

In the Marine Mammal Protection Act (MMPA) of 1972, 16 U.S.C. §§ 1361–1389, Congress declared that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic" and "that they should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem." *Id.* § 1361(6). The D.C. Circuit has stated that the MMPA's "primary goal" is to "protect[] marine mammals" and that "[t]he interest in maintaining healthy populations of marine mammals comes first" under the statute. *Kokechik Fishermen's Ass'n v. Sec'y of Comm.*, 839 F.2d 795, 800, 802 (D.C. Cir. 1988).

In enacting the MMPA, Congress recognized that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). It determined that "such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part" and that "they should not be permitted to diminish below their optimum sustainable population." *Id.* § 1361(2). The statute defines

"optimum sustainable population" to mean "the number of animals which will result in the maximum productivity of the population or species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." *Id.* § 1362(9).

To accomplish these objectives, the MMPA establishes a complete moratorium on the "taking" of marine mammals, *id.* § 1371(a), and expressly prohibits the unpermitted "take" of a marine mammal by any person. *Id.* § 1372(a)(1), (2); *see also id.* § 1362(8) (defining "moratorium" as "the complete cessation of the taking of marine mammals . . . except as provided in this chapter"). Prohibited takes include actions that harass, capture, or kill marine mammals as well any act that "has the potential to injure a marine mammal" or disrupt behavioral patterns, including migration, breathing, breeding, or feeding. *Id.* § 1362(13) (defining take), (18)(A) (defining harassment); *see also* 50 C.F.R. § 216.3 (further defining "take" to include "the restraint or detention of a marine mammal, no matter how temporary" and any act "which results in disturbing or molesting a marine mammal"). The take prohibitions apply not only to intentional takes but also to incidental take, any "non-intentional or accidental act that results from, but is not the purpose of, carrying out an otherwise lawful action." *Id.* § 229.2. The MMPA authorizes the Secretary of Commerce to prescribe such regulations as are necessary and appropriate to carry out the statute's purposes. 16 U.S.C. § 1382(a).

Congress specifically recognized that the statute would provide much-needed authority to regulate vessels that may harass, harm, or kill marine mammals. The House Report from the Committee on Merchant Marine and Fisheries stated that "[s]till another problem to which marine mammals may be inadvertently exposed is the operation of high-speed boats. Manatees and sea otters have been crippled and killed by motorboats and at present the Federal government is essentially powerless to force these boats to slow down or to curtail their

operations." *See* 1972 H.R. Rep. No. 92-107 (1972) *reprinted in* 1972 U.S.S.C.A.N. 4144, 4147; *see also id.* at 4150 (identifying a principal hazard to manatees as "the operation of powerboats in areas where the manatees are found" and stating that the MMPA "would provide the Secretary of the Interior with adequate authority to regulate or even forbid the use of [such] powerboats[.]" *Id.* at 4150.

## III.    Administrative Procedure Act

The Administrative Procedure Act (APA) establishes general rules governing the issuance of proposed and final regulations by federal agencies. 5 U.S.C. §§ 551–559. It defines a "rule making" as the "process for formulating, amending, or repealing a rule." *Id.* § 551(5). Absent narrow circumstances, a federal agency must publish a notice of and allow public comment on any proposed "rule making." *Id.* § 553(b), (c).

The statute establishes that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." *Id.* § 553(e). It also requires that, "within a reasonable time, each agency shall proceed to conclude a matter presented to it." *Id.* § 555(b). Further, the agency must give "prompt notice" of the "denial in whole or in part" of a written petition, together with a "brief statement of the grounds for denial." *Id.* § 555(e).

The APA's judicial review provisions, 5 U.S.C. §§ 701–706, apply to all agency actions unless a statute precludes judicial review or an action is committed to agency discretion by law. *Id.* § 701(a). "Agency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act.*" *Id.* § 551(13) (emphasis added). A reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed[.]" *Id.* § 706(1).

## FACTUAL BACKGROUND

**I.      Vessel Strikes Are an Existential Threat to the Critically Endangered Right Whale**

With fewer than 340 surviving North Atlantic right whales, the species is near the brink

of extinction. *See* Ex. 2 at 3–4 (estimate of 336 right whales in 2020).[2] After centuries of

whaling, the right whale had been nearly extirpated by the early twentieth century. 2020_PET

002126.[3] Despite some population gains since whaling ceased, the species' future is again in

doubt because humans are killing right whales faster than they can reproduce. *Id.* Vessel strikes

and entanglement in fishing gear are the primary human-caused impacts inhibiting the species'

recovery and threatening its survival. *Id*. Right whales do not live long enough to die of old age

because they are killed by vessel collisions and entanglements. Ex. 3.

The right whale has been protected under federal law for more than fifty years. Up until

2010, these protections had resulted in a slow but steady recovery trajectory. *See, e.g.*, Ex. 2 at 3

(Fig. 1). Since 2010, however, the right whale population has declined every year. Calving rates

have significantly decreased. NMFS reports that there have been 50 observed right whale

mortalities and serious injuries[4] since 2017, constituting an Unusual Mortality Event. 2020_PET

002126; Ex. 4 at 2 (agency statement that these dead and seriously injured whales "are a

---

[2] As explained below and in the accompanying Statement of Undisputed Material Facts, review of Plaintiffs' unreasonable delay claim under 5 U.S.C. § 706(1) is not limited to an administrative record. The Declaration of Kristen Monsell, Ex. 1, describes 14 documents (Exs. 2–15) not included in Defendants' administrative record. These consist of documents submitted to NMFS with the 2020 Petition, pages from NMFS's website, or other publicly available documents.

[3] Bates numbers starting with AR refer to documents included in the administrative record Federal Defendants lodged March 15, 2021. ECF No. 9-1 (index); *see also* ECF No. 13-1 (record documents). Bates numbers starting with PET_2020 refer to documents included in the updated administrative record Federal Defendants lodged on January 26, 2022. ECF No. 18-1 (index).

[4] NMFS defines "serious injury" to mean "any injury that will likely result in mortality." 50 C.F.R. § 229.2.

significant setback to the recovery of this endangered species."). The actual number of right whale mortalities and serious injuries since 2017 is significantly higher, given that most right whale mortalities are not observed. 2020_PET 000070; *see also* Ex. 5 at 6 (scientific paper by NMFS scientists and others demonstrating that between 2010 and 2017 only *29 percent* of right whale mortalities were detected, a level of unobserved deaths substantially higher than previously assumed).

In the last decade, the right whale population has decreased by an astonishing 30 percent—a wholly unsustainable rate of loss. Ex. 2 at 4 (481 right whales in 2011 versus 336 in 2020). The population declined eight percent from 2019 to 2020 alone. *Id*. at 3. The decline since 2011 has completely wiped out the species' recovery gains of the decade before that. *See id.* at 4. The current population number is back down to 2001 levels. *Id.*

In 2019, NMFS classified the right whale as one of nine species whose extinction is almost certain in the immediate future if existing threats are not dramatically reduced. 2020_PET 002125. Also in 2019, NMFS described the right whale situation as "an urgent conservation crisis" that requires "immediate action to protect the species." Ex. 6 at 1. The agency further stated that "protecting every individual is a top priority" and that "[r]ight whales cannot withstand continued losses of mature females—we have reached a critical point." *Id.* at 4. Recognizing the species' perilous state, in 2020, the International Union for Conservation of Nature changed the species' Red List status from "endangered" to "critically endangered." Ex. 2 at 5. It is the only species of large whale with this designation. *Id.*

As NMFS explicitly acknowledged only a week and a half ago, humans are killing right whales faster than they can reproduce. Ex. 7 at 2. Alarmingly, right whale experts estimate that there are fewer than 70 surviving reproductively active females. *Id.* at 1. NMFS states that

because "right whales are dying faster than they can reproduce. . . . [E]very whale counts." *Id.*

The agency further states that, "given the estimated rate of human-caused mortality and serious

injury, we need approximately 50 or more calves per year for many years to stop the decline and

allow for recovery." *Id.* at 2. Calving rates over the past thirteen years have been far, far lower.

Ex. 2 at 5 (Table 2). Moreover, the 70 surviving reproductively active female right whales do not

calve every year; over the same time frame, calving intervals have ranged from 3.3 to 10.2 years

between calves. *Id.* (Table 2); *see also id.* (text) ("[R]ight whale births remain significantly

below what is expected and the average inter-birth interval remains high."). In the 2022 calving

season, only thirteen calves have been observed to date. Ex. 7 at 2. NMFS concludes that "[t]he

only solution is to significantly reduce human-caused mortality and injuries, as well as stressors

on reproduction." *Id.*

      Vessels kill or injure right whales through blunt force trauma and/or propeller strikes that

result in deep, broad wounds, massive blood loss, crushed bones, and/or amputations. 73 Fed.

Reg. 60,173, 60,174 (Oct. 10, 2008). Many living whales bear wounds or scars from nonlethal

collisions, which can weaken or otherwise adversely affect right whales such that they are

vulnerable to subsequent injury or death. Ex. 8 at 20. For example, a female right whale

nicknamed Lucky "survived lacerations from a 1991 collision when she was a calf, only to die in

January 2005 when she became pregnant for the first time and the old wounds reopened."

2020_PET 000067.

      NMFS has long recognized vessel strikes as a primary threat to the right whale's survival

and recovery. For example, the 2005 recovery plan for the species states that "[s]hip collisions

and entanglements in fishing gear are the most common anthropogenic causes of mortality in

North Atlantic right whales" and that "[a]ction is urgently needed to reduce these significant

threats, and thus improve the survival of right whales." Ex. 9 at v. It concludes that "[t]he most significant need for North Atlantic right whale recovery is to reduce or eliminate deaths and injuries from anthropogenic activities, namely shipping and commercial fishing operations." *Id.*

NMFS has reiterated this conclusion multiple times since the Unusual Mortality Event began in 2017. For example, its 2017 status review stated that "eliminat[ing] lethal right whale ship strikes" is one of the steps necessary to recover the species and that the recovery goal of having "[a]dequate regulations or other means to minimize ship strikes . . . in place and being implemented" has not been met. Ex. 10 at 10, 18; *see also* Ex. 6 at 2 (2019 agency statement that "[v]essel strikes and entanglement in fishing gear are the two greatest threats to these whales."). In 2021, NMFS concluded that "[m]inimizing the risk of vessel strikes (from both small and large vessels) is critical to improving right whale survival." 2020_PET 002131. And in late January 2022, it reiterated that because "[t]he primary causes of the Unusual Mortality Event are entanglements in fishing gear and collisions with boats and ships. . . . The only solution is to significantly reduce human-caused mortality and injuries, as well as stressors on reproduction." Ex. 7 at 2.

NMFS claims that "[e]very single female North Atlantic right whale and calf are vital to this species' recovery." *Id.* at 1. Pregnant females and mothers with nursing calves are particularly vulnerable to vessel strikes because of how much time they spend at the water's surface of the water. 73 Fed. Reg. at 60,174, 60,176; 2020_PET 000066. Juveniles are also at higher risk of vessel collisions. *Id.* Over the past two years alone, vessel strikes have killed or seriously injured three right whale calves and one mother. Ex. 4 at 6–7.

NMFS has determined that the human-caused death or serious injury of 0.8 right whales[5] per year is unsustainable if the population is to recover. Ex. 8 at 18; *see also* Ex. 3 at 2 (NMFS statement that "[s]urvival of this species depends on no more than one whale death per year."). Vessel strikes killed or seriously injured two right whales (nearly 2.5 times PBR) in U.S. waters in 2021 alone. Ex. 4 at 6–7.

## II.     NMFS's 2008 Vessel Speed Rule and Plaintiffs' Rulemaking Petitions

### A.     1999–2008: NMFS's Nearly Decade-Long Rulemaking, Two Petitions, and Two Lawsuits

The history of the 2008 Vessel Speed Rule is one of agency foot-dragging and delay, punctuated by petitions and litigation by conservation organizations. Start to finish, it took NMFS more than nine years to promulgate the rule.

In May 1999, NMFS initiated a series of stakeholder meetings to discuss ways of reducing vessel strikes. 71 Fed. Reg. 36,299, 36,301 (June 26, 2006). The agency then took another two years to commission a report based on those stakeholder meetings with recommended vessel strike reduction measures. *Id.* Five years later, in June 2004, NMFS finally initiated rulemaking under the ESA and MMPA via an advance notice of proposed rulemaking for right whale ship strike reduction. *See* 69 Fed. Reg. 30,857 (June 1, 2004).

A year later, with no proposed rule in sight, a coalition of conservation organizations, including two Plaintiff groups, petitioned NMFS to initiate emergency rulemaking to protect right whales from vessel strikes pending the completion of a final rule. NMFS published a notice

---

[5] This number is called the "potential biological removal" level or "PBR," which "means the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. § 1362(20). The MMPA requires NMFS to establish PBRs in stock assessment reports. *Id.* § 1386(a)(6). The recent population decline means the right whale's PBR should also decline to 0.7 in the 2021 final stock assessment report. Ex. 2 at 2.

in the Federal Register denying the petition. 70 Fed. Reg. 56,884 (Sept. 29, 2005); *see also*

*Defenders of Wildlife v. Gutierrez*, 484 F. Supp. 2d 44, 53–54 (D.D.C. 2007), *aff'd in part and

rev'd in part*, 532 F.3d 913, 920–21 (D.C. Cir. 2008) (upholding NMFS's denial of petition). [6]

During the district court proceedings on NMFS's denial of the emergency rulemaking

petition, the agency published the proposed vessel strike rule. 71 Fed. Reg. at 36,299. NMFS

informed the court that it anticipated taking final action on the proposed rule in June 2007.

*Defenders of Wildlife*, 484 F. Supp. 2d at 50.

In January 2008, a year and a half after the proposed rule published and more than six

months after the agency had represented that it would publish the final rule, a conservation

coalition petitioned NMFS again, this time to issue interim implementing regulations to remain

in effect until the final rule published. *Defenders of Wildlife v. Gutierrez*, No. 1:08-cv-01107-

PLF (D.D.C. June 26, 2008), Compl., ECF No. 1, ¶¶ 1–2, 37. Five months later, at oral argument

on the conservation coalition's appeal of the denial of their first petition, NMFS announced it

was denying the second petition. *Id.* ¶ 38. The conservation coalition brought suit challenging

NMFS's failure to finalize the proposed regulations as agency action unlawfully withheld or

unreasonably delayed and challenging NMFS's denial of the second petition as arbitrary and

capricious. *Id.* ¶¶ 41–44.

**B.      2008–2013: Vessel Speed Rule, Plaintiffs' 2012 Petition, and Rulemaking to
           Eliminate Five-Year Sunset Clause**

In October 2008, while the conservation coalition's second district court action was

---

[6] "The petition under review noted that since the start of 2004, the year in which NMFS
published its [Advance Notice of Proposed Rulemaking] on right whale ship strikes, eight right
whales had died, four from ship strikes, and that five of those killed were adult females—'at least
three of which were pregnant at the time they were killed.'" *Defenders of Wildlife*, 532 F.3d at
920 (quoting 2005 emergency rulemaking petition).

pending, NMFS finally issued a regulation under its ESA and MMPA authorities to reduce vessel strikes of right whales.[7] *See* 73 Fed. Reg. 60,173 (Oct. 10, 2008) (*codified at* 50 C.F.R. § 224.105). NMFS based the rule on a comprehensive review of scientific data demonstrating that higher vessel speeds increase both the likelihood of a vessel strike and the probability that a vessel collision will cause the death or serious injury of a right whale. *Id.*

The 2008 Vessel Speed Rule requires vessels 65 feet in length and greater to slow to ten nautical miles per hour ("knots") or less in certain right whale habitat areas at certain times of year. *See* 50 C.F.R. § 224.105(a)–(b). These are known as Seasonal Management Areas. *See* 73 Fed. Reg. at 60,178; *see also* 50 C.F.R. § 224.105(a)(1)–(3). The rule contains an exemption allowing regulated vessels to deviate from the speed limit for safety reasons when ocean or weather conditions demand it, so long as the deviation is attested to in the vessel's logbook. *Id.* § 224.105(c). The rule also exempts outright vessels owned, operated by, or under contract to the federal government as well as law enforcement vessels of a state or political subdivision when engaging in law enforcement or search and rescue operations. *Id.* § 224.105(a).

The 2008 rule also established a voluntary Dynamic Management Area program. 73 Fed. Reg. at 60,179–180. Under this program, when an aggregation of three or more right whales is sighted in an area not covered by a Seasonal Management Area, NMFS sends out a notification asking (but not requiring) mariners to avoid the area or slow to ten knots or less when traveling through it. *Id.* at 60,180. These voluntary zones last for 15 days, unless extended for an additional based on resighting right whales in the same area. *Id.*

---

[7] Over the decade between 1999, when NMFS first started efforts toward a vessel strike reduction regulation, and 2008, when it promulgated the rule, vessel strikes caused ten right whale mortalities, two serious injuries, and five non-serious injuries confirmed to have occurred in U.S. waters. 2020_PET 000066. An additional eight injuries due to vessel strikes were first detected in U.S. waters over the same period. *Id.*

NMFS responded to comments suggesting the rule lower the minimum vessel size to vessels 40 feet and longer by stating that it "agree[d] that vessels less than 65 ft . . . may pose a threat to right whales" and that the agency "will continue to consider means, including future rulemaking, to address vessel classes below 65 ft[.]" *Id.* at 60,180.

The 2008 Vessel Speed Rule contained a five-year sunset clause under which the rule would expire in 2013. *Id.* at 60, 183, 60,186. In light of the sunset clause and scientific information indicating the rule had been effective at reducing risk but was not sufficiently protective, a subset of Plaintiffs petitioned NMFS in June 2012 to expand the rule. AR000020. The 2012 Petition requested that NMFS amend the rule to make compliance with Dynamic Management Areas mandatory, rather than voluntary, based on the agency's data and analysis demonstrating a marked lack of mariner adherence to voluntary speed limits. It also asked that NMFS expand the geographic and temporal scope of certain Seasonal Management Areas and consider applying the rule to vessels less than 65 feet. It also asked that NMFS make any new regulation permanent without a sunset clause. AR00021, 000028–38.[8]

In 2013, NMFS published a proposed rule to eliminate the sunset clause and make the rule permanent. 78 Fed. Reg. 34,024 (June 6, 2013). The proposed rule did not mention the 2012 Petition, let alone respond to it. *Id.* Following a public comment period, NMFS issued a final rule eliminating the sunset provision in December 2013. 78 Fed. Reg. 73,726 (Dec. 9, 2013). The rule did not change any substantive component of the Vessel Speed Rule. *See id.* To the contrary, in

---

[8] As explained above, following the commencement of this litigation NMFS sent Plaintiffs a letter that this Court has ruled constitutes a denial of the 2012 Petition. 2020_PET 000268–69. In that letter, NMFS stated it "recognize[s] the urgent nature of the situation with right whales, and the continued decline of the population." *Id.* at 000268.

response to comments, NMFS stated that it could not take any additional action because the proposed rule was limited to eliminating the sunset clause. *Id.* at 73,734.

The final rule stated NMFS's intention to synthesize, review, and issue a report for public comment no later than January 1, 2019, on the rule's effectiveness in reducing vessel strike-caused right whale deaths as well as on mariner response to and economic impacts of the rule. *See id.* at 73,734–735; 50 C.F.R. § 224.105(d).

### C.     2013–2020: Continuing Vessel Strikes, Unusual Mortality Event, and Plaintiffs' 2020 Petition

While the initial implementation of the 2008 Vessel Speed Rule lessened the risk of deaths and serious injuries from vessel strikes within Seasonal Management Areas, available scientific information demonstrates that vessels less than 65 feet in length are known to kill whales and that the risk of vessel strikes has increased outside Seasonal Management Areas. *See, e.g.*, 73 Fed. Reg. at 60,180; Ex. 10 at 17–18; *see also* Ex. 11 at 1 (2014 scientific study recommending that NMFS expand the designated Seasonal Management Areas to better protect right whales from vessel strikes). Additionally, numerous scientific studies, including from NMFS itself, have concluded that compliance with voluntary measures via the Dynamic Management Area program is poor and voluntary measures are ineffective at reducing risk. *See, e.g.*, Ex. 11 at 3 (noting compliance with Dynamic Management Areas "was very poor"); Ex. 10 at 18 (NMFS's 2017 right whale status review noting studies have demonstrated "compliance with the voluntary speed restrictions within [Dynamic Management Areas] was poor, with vessels showing a very modest reduction in speed that was unlikely to reduce ship strike risk significantly"); Ex. 12 at 3, 6 (2020 analysis finding that more than 41 percent of vessels transiting a Dynamic Management Area south of Nantucket traveled in speeds in excess of 10 knots, with ship speeds exceeding 22 knots reported).

From 2013 through 2020, NMFS documented at least 12 right whale-vessel collisions in U.S. waters. 2020_PET 000161 (ten from 2013 through 2018); Ex. 4 at 6–7 (two in 2020). Six of those collisions resulted in mortalities or serious (i.e., likely lethal) injuries. 2020_PET 000161; Ex. 4 at 6–7. One of the right whales killed in 2020 was a calf that had been struck by vessels on at least two separate occasions. Ex. 13 at 2. In announcing the news, NMFS noted that while "the loss of every right whale is a detriment to this critically endangered species, . . . it is particularly hard when we lose a calf, given how few have been born in the last several years." *Id.*

Nevertheless, NMFS still did not initiate rulemaking to expand the 2008 Vessel Speed Rule to provide right whales with additional mandatory protections. Instead, in August 2020, despite overwhelming evidence that voluntary measures do not sufficiently reduce risk, NMFS established a new voluntary program known as the Right Whale Slow Zones campaign. 2020_PET 000031. It is identical to the Dynamic Management Areas program, except that a Right Whale Slow Zone can be triggered by acoustic detections of right whales in addition to visual observations. *Id.*

In response to ongoing vessel strikes, overwhelming scientific evidence on the right whale's population decline, the need to reduce vessel collisions, and NMFS's continued inaction on their 2012 Petition, in August 2020, Plaintiffs filed their second rulemaking petition to expand the 2008 Vessel Speed Rule. 2020_PET000001. The 2020 Petition requested that NMFS issue regulations applying the speed limit to vessels less than 65 feet in length, make compliance with Dynamic Management Areas mandatory, and modify the trigger for a Dynamic Management Area to include any sighting of a mother and her calf. 2020_PET 000003. It also asked that NMFS extend the geographic and temporal scope of existing Seasonal Management Areas in the Northeast, the mid-Atlantic, and the Southeast. *Id.*

### D.      2021–present: More Vessel Strikes and Vessel Speed Rule Assessment Report

Soon after Plaintiffs filed this case, and more than two years after the January 2019

deadline the agency had set for itself, *see* 78 Fed. Reg. at 73,734–735; 50 C.F.R. § 224.105(d),

on January 21, 2021, NMFS made public its long-overdue assessment of the efficacy of the

Vessel Speed Rule. 2020_PET 000035–87; 2020_PET 000252. Although the Assessment itself is

dated June 2020, 2020_PET 000035, NMFS offers no explanation for its delayed release.

The Assessment concludes "that continued speed restrictions are warranted in light of the

positive effect the speed rule has had in reducing the number of serious injuries and mortalities

of right whales." 2020_PET 000079. It also "suggest[s]" several "recommendations" for how the

rule could be improved "to ensure levels of effectiveness consistent with right whale recovery

needs." *Id.* These include, for example, designating new Seasonal Management Areas where

right whales have repeatedly been observed or struck by vessels; addressing collision risk from

vessels less than 65 feet in length given that they are "ubiquitous in portions of right whale

habitat" and there have been a "number of documented and reported small vessel collisions with

whales"; and modifying the Dynamic Management Area program given low compliance with

these voluntary measures. *Id.* at 000079–80. The Assessment does not state whether NMFS

intends to issue a new rule to implement any of the suggested recommendations or otherwise

provide any timeframe for future regulatory actions to better protect right whales from vessel

strikes. *See id.* at 000035–87.

Plaintiffs submitted detailed comments on the Assessment. 2020_PET 00782–793. Those

comments urged NMFS to immediately initiate rulemaking consistent with Plaintiffs' 2020

petition and expeditiously finalize an expanded vessel speed rule. 2020_PET 00782. The Marine

Mammal Commission—an independent federal agency charged with making recommendations

17

to NMFS on matters related to marine mammals, 16 U.S.C. §§ 1401–02—also urged NMFS to move forward with a rulemaking rapidly. 2020_PET 000326–331. The Commission noted that NMFS's "assessment of the vessel speed rule clearly demonstrates deficiencies in several aspects of the rule and its implementation that need to be rectified urgently to further reduce risk to right whales." *Id.* at 000327. It urged NMFS to modify existing Seasonal Management Areas and establish new ones and make compliance with voluntary measures mandatory, among other recommendations. *Id.* at 000328–331; *see also* 2020_PET 000332–334 (comments from the Atlantic Scientific Review Group supporting expansion of the 2008 Vessel Speed Rule); 2020_PET 000335–37 (comments from the State of Maine Department of Marine Resources stating it "strongly recommends NMFS undertake regulatory action to modify the existing vessel speed rules" by expanding its protections).

Since the close of public comment on the Assessment on March 26, 2021, *see* 2020_PET 000254, NMFS has taken no action to publish a notice of proposed rulemaking (NPRM) to amend the 2008 Vessel Speed Rule or otherwise render a final decision on Plaintiffs' 2020 Petition. The Spring 2021 Unified Agenda[9] dated June 2021 indicated an NPRM would be forthcoming in April 2022 with final action anticipated in August 2022. 2020_PET 002146. In November 2021, NMFS sent letters to Plaintiffs acknowledging receipt of the 2020 Petition and comments on the Assessment and conveying that, as per the Spring 2021 Unified Agenda, the agency "anticipates releasing a proposed rule to modify the speed rule in Spring 2022 and a final rule in Fall 2022 (before the calving season begins)." 2020_PET 002161–162. The Fall 2021

---

[9] The Unified Agenda is published by the Office of Information and Regulatory Affairs within the Office of Management and Budget. *See* https://www.reginfo.gov/public/do/eAgendaMain

Unified Agenda dated December 2021 pushes the NPRM's anticipated date to May 2022 but makes no mention of a date for final rulemaking. 2020_PET 002163.

In February 2021, a boat less than 65 feet in length struck a mother-calf right whale pair off St. Augustine, Florida, killing the month-old calf outright and seriously injuring the first-time mother. *See* Ex. 2 at 5; Ex. 4 at 6–7; Ex. 14 at 2; Ex. 15 at 1. Although the strike occurred within a Seasonal Management Area, the vessel was not subject to any speed restrictions due to its size. Ex. 2 at 5. The mother (Infinity, #3230) has not been seen since. *Id.* at 6; *see also id.* at 5–6 (scientists concluding that these incidents "underscore[] the immediacy of necessary changes to measures to include smaller vessels").

Overall, since NMFS promulgated the 2008 Vessel Speed Rule, more than 35 right-whale-vessel collisions have been documented in U.S. waters. 2020_PET 000160–61; Ex. 4 at 4–7. Six right whales were killed and six were classified as serious (i.e., likely lethal) injuries. 2020_PET 000160–61; Ex. 4 at 4–7. Despite these incidents, and NMFS's repeated pronouncements that the right whale needs more regulatory protections from vessel strikes, the agency's actions have not matched its words. NMFS's unreasonable delay in expanding the 2008 Vessel Speed Rule continues.

## STANDING

Plaintiffs have standing. To demonstrate standing, a plaintiff must show: (1) "it has suffered a concrete and particularized injury that is either actual or imminent," (2) "that the injury is fairly traceable to the defendant," and (3) "that it is likely that a favorable decision will redress that injury. *Mass. v. EPA*, 504 U.S. 497, 517 (2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Friends of the Earth v. Laidlaw Envtl. Servs.*,

528 U.S. 167, 180–81 (2000) ("relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff.").

When a plaintiff "to whom Congress has accorded a procedural right to protect his concrete interests," including challenging an agency action unlawfully withheld or unreasonably delayed, that plaintiff "can assert that right without meeting all the normal standards for redressability and immediacy." *Mass. v. EPA*, 504 U.S. at 517–18 (cleaned up). Where the procedural injury a plaintiff claims is tied to that person's "concrete aesthetic and recreational interests," that person has sufficiently demonstrated injury in fact. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). A plaintiff in a procedural case "has standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Mass. v. EPA*, 504 U.S. at 518 (emphasis added).

Plaintiffs' members have protectable aesthetic, recreational, scientific, spiritual, and other interests in right whales. *See* Declarations of Regina Asmutis-Silvia ("Asmutis-Silvia Decl."), Ex. 16; Sharon Young, Ex. 17; Viola Patek ("Patek Decl."), Ex. 18; Molly Bartlett, Ex. 19. For example, one of Plaintiffs' members "enjoy[s] watching right whales during the late winter and early spring each year" and will continue to do so every year, including 2022. Asmutis-Silvia Decl. ¶ 20; *see also Lujan*, 504 U.S. at 562–63 ("the desire to . . . observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"). "Given the limited number of surviving right whales and the catastrophic risk that any additional harm poses to the species, [she is] particularly worried about the impact of vessel strikes on this vulnerable species' ability to survive and recover." Asmutis-Silvia Decl. ¶ 27.

These members have suffered, and, without judicial redress, will continue to suffer, concrete and particularized injuries to these interests caused by NMFS's failure to act. There is a

direct causal connection between NMFS's unreasonable delay in acting on Plaintiffs' 2020

Petition—i.e., Plaintiffs' procedural injury—and Plaintiffs' concrete aesthetic, recreational, and

other protectable interests in the survival and recovery of the right whale. *WildEarth Guardians*,

738 F.3d at 306. By failing to act on Plaintiffs' 2020 Petition, NMFS is failing to sufficiently

protect right whales from one of the two primary threats to their continued existence. *See* Patek

Decl. ¶ 15 (NMFS's inactions "imperil my recreational and personal continued interest in the

species, as well as my wellbeing and happiness because it endangers North Atlantic right whales

as a species, as well as the individual North Atlantic right whales that I have observed and felt a

connection with").

A favorable decision will redress these injuries. *See Ctr. for Biological Diversity v. EPA*,

861 F.3d 174, 185 (D.C. Cir. 2017). If the Court directs NMFS take final action on Plaintiffs'

petition, Plaintiffs need not show Defendants "would" expand the 2008 Vessel Speed Rule (i.e.,

demonstrate the 2020 Petition's merits); Plaintiffs only need to show NMFS "*could* reach" such

a conclusion. *Id.*; *see also* 2020_PET 000079 (agency's assessment of 2008 Vessel Speed Rule

recommending improvements "to ensure levels of effectiveness consistent with right whale

recovery needs.").

Plaintiffs also have associational standing. *See Hunt v. Wash. State Apple Advert.*

*Comm'n*, 432 U.S. 333, 342–43 (1977). As environmental advocacy organizations, Plaintiffs

have standing to sue on their members' behalf. Their members have standing to sue in their own

right. Plaintiffs' interests in protecting right whales from entanglements are germane to their

organizational purposes. *See* Asmutis-Silvia Decl., Ex. 16; Declaration of Sean Mahoney, Ex.

20; Declaration of Michael Senatore, Ex. 21; Declaration of Miyoko Sakashita, Ex. 22. Neither

the claims asserted nor the relief requested require individual member participation.

## SCOPE AND STANDARD OF REVIEW

Summary judgment is appropriate if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 325 (1986).

"Under the APA a federal agency is obligated to 'conclude a matter' presented to it 'within a reasonable time.'" *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (citing 5 U.S.C. § 555(b)). "[I]nordinate agency delay . . . frustrate[s] congressional intent by forcing a breakdown of regulatory processes." *Cutler v. Hayes*, 818 F.2d 879, 897 n.156 (D.C. Cir. 1987) (citation omitted). Accordingly, the APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Courts must compel such actions because "[t]here comes a point when relegating issues to proceedings that go on without conclusion in any kind of reasonable time frame is tantamount to refusing to address the issues at all and the result is a denial of justice." *Nader v. FCC*, 520 F.2d 182, 206 (D.C. Cir. 1975) (citation omitted); *see also In re Am. Rivers*, 372 F.3d at 418 (courts will "interfere with the normal progression of agency proceedings to correct transparent violations of a clear duty to act") (citations omitted).

Because Plaintiffs' claim arises under APA section 706(1), the Court's review is not limited to an administrative record. *See, e.g.*, *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) ("when it comes to agency *inaction* under 5 U.S.C. § 706(1), 'review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record.'") (quoting *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000)); *see also Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("*TRAC*") ("It is

obvious that the benefits of agency expertise and creation of a record will not be realized if the agency never takes action."). "Indeed, the Court cannot decide this claim based solely on the administrative record because agency inaction generally does not produce a record at all." *Gona v. U.S. Citizenship & Immigration Servs.*, No. 1:20-cv-3680-RCL, 2021 WL 1226748, at *2 (D.D.C. Apr. 1, 2021) (citations omitted).

In determining whether an agency's failure to act is unreasonably delayed under APA section 706(1), the D.C. Circuit applies what are known as the "TRAC" factors. *TRAC*, 750 F.2d at 80 (internal citations omitted). Specifically, a court must consider:

> (1) "the length of time that has elapsed since the agency came under a duty to act,"
> (2) "the reasonableness of the delay must be judged in the context of the statute which authorizes the agency's action,"
> (3) "the consequences of the agency's delay," and
> (4) "any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources."[10]

 *In re Int'l Chem. Workers Union*, 958 F. 2d 1144, 1149 (D.C. Cir. 1992) (cleaned up). Further, "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *TRAC*, 750 F.2d at 80 (cleaned up). "As a general rule, Section 706 of the APA 'leaves in the courts the discretion to decide whether agency delay is unreasonable.'" *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001) (quoting *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999)). "[O]nce a court deems agency delay unreasonable, it must compel agency action." *Forest Guardians*, 174 F.3d at 1191.

---

[10] Although *TRAC* lays out six factors, several of them overlap, and courts often condense the six factors to four. *Compare TRAC*, 750 F.2d at 80 (six factors) *with In re Int'l Chem. Workers Union*, 958 F. 2d 1144, 1149 (D.C. Cir. 1992) (four factors); *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001) (four factors).

## ARGUMENT

Whether an agency's delay is unreasonable under the APA "necessarily turns on the facts of each particular case[.]" *Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 359 (D.C. Cir. 1987). The agency's delay in acting on Plaintiffs' 2020 Petition is unreasonable given the right whale's critically endangered status and the role vessel strikes are playing in its decline. NMFS describes the species' status as a "conservation crisis," states that protecting every individual right whale is the agency's highest priority, and concludes that reducing vessel strikes is essential to save the species from extinction. The agency's delay undermines the conservation purposes for which Congress enacted the ESA and MMPA. Plaintiffs are entitled to summary judgment.

## I.     NMFS's 18-Month (and Counting) Delay on the 2020 Petition Is Unreasonable

Applying the first *TRAC* factor, the Court evaluates "the length of time that has elapsed since the agency came under a duty to act." *In re Int'l Chem. Workers Union*, 958 F.2d at 1139 (citation omitted). As the D.C. Circuit has held, while "'[t]here is no *per se* rule as to how long is too long,' a 'reasonable time for agency action is typically counted in weeks or months, not years.'" *In re Public Emples.*, 957 F.3d 267, 274 (D.C. Cir. 2020) (citing *In re Am. Rivers*, 372 F.3d at 419). The Court must examine the delay in the context of the relevant substantive statues "and in harmony with the principles articulated herein." *Cutler*, 818 F.2d at 899.

NMFS came under a duty to act on Plaintiffs' 2020 Petition on August 6, 2020. As of today, nearly eighteen months have lapsed since then. By the time briefing is complete and Plaintiffs file the joint appendix, it will have been twenty months since Plaintiffs filed their 2020 Petition. *See* Minute Order of Dec. 7, 2021 (scheduling order).

While this Court has determined that only Plaintiffs' Second Claim on NMFS's unreasonable delay on the 2020 Petition remains to be adjudicated, ECF No. 14, it is indisputable

that NMFS has been aware of the ongoing impacts of vessel strikes on right whales as well as the species' precipitous decline since well before August 2020. *See, e.g.*, *supra* at 7–11, 15–16 (describing NMFS's findings and other reports); *see also* Ex. 3 at 3 (NMFS noting that vessel strikes are one of the leasing causes of right whale mortality and the agency "need[s] to do more" to protect right whales from vessel strikes). Moreover, notwithstanding that it was not released for public comment until January 2021, the June 2020 date on the Assessment clearly indicates that NMFS had already concluded that the 2008 Vessel Speed Rule is not sufficiently protective two months before Plaintiffs submitted their petition in August. *See* 2020_PET 000035; *Cobell*, 240 F.3d at 1097 (finding delay unreasonable, in part, because "[f]ederal officials were aware of their . . . obligations long before . . . the initiation of this action . . . and yet little progress has been made in discharging those duties.").

Nor should the Court place a great deal of weight on NMFS's purported plan to initiate rulemaking to expand the Vessel Speed Rule sometime this year. *See* 2020_PET 002161; 2020_PET 002163. NMFS's history of delay in acting to promulgate the 2008 Vessel Speed Rule in the first instance—or in acting on Plaintiffs' 2012 and 2020 rulemaking petitions— demonstrate that the agency often fails to meet its own projected timeframes. *See supra* at 11–17; *see also Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 15–17 (D.D.C. 2003) (finding agency's failure to revise critical habitat for endangered bird has "serious consequences" for bird's survival and agreeing that agency's assertion that it would complete action "'as soon as feasible' is as good as 'never'"); *Pub. Citizen Health Research Grp. v. Brock*, 823 F.2d 626, 629 (D.C. Cir. 1987) ("In light of the fact that [the agency's] timetable representations have suffered over the years from a persistent excess of optimism, we share petitioners' concerns as to the probable completion date of the rulemaking."). Here, where the agency has already delayed

acting on Plaintiffs' 2020 Petition for nearly eighteen months and has not guaranteed when it will complete rulemaking, it is not acting according to a "rule of reason." *TRAC*, 750 F.2d at 80. The first *TRAC* factor weighs in Plaintiffs' favor.

## II. The Agency's Delay Undermines Congress' Intent in Enacting the MMPA and ESA

Applying the second *TRAC* factor, the Court must consider "the context of the statute which authorizes the agency's action." *Cobell*, 240 F.3d at 1096. This requires "an examination of any legislative mandate in the statute" and requires a court to consider whether the "delay may be undermining the statutory scheme[.]" *Cutler*, 818 F.2d at 897–98. Here, NMFS's unreasonable delay in acting on Plaintiffs' 2020 Petition is resulting in serious harm to the national interests in marine mammal and endangered species conservation that the MMPA and ESA were enacted to promote. "Given that there are a few precious [North Pacific] right whales left . . . and even fewer females, delay—of any length of time—brings the species closer to extinction." *Ctr. for Biological Diversity v. Evans*, No. C 04-04496 WHA, 2005 WL 1514102, at *4 (N.D. Cal. June 14, 2005).

Congress enacted the MMPA in 1972 to protect the right whale and other marine mammals. Finding that some species "are, or may be, in danger of extinction . . . as a result of man's activities;" Congress directed that marine mammals "be protected and encouraged to develop to the greatest extent feasible[.]" 16 U.S.C. § 1361(1), (6). "The unquestionable primary purpose of the MMPA is to prevent marine mammals from falling below their optimum sustainable population . . . and to replenish any depleted species." *Earth Island Inst. v. Brown*, 865 F. Supp. 1364, 1370 (N.D. Cal. 1994). Congress specifically instructed that "measures should be immediately taken" for species like the right whale "which has already diminished below [its optimum sustainable] population." *Id.* (citing 16 U.S.C. § 1361(2)). The legislative

history demonstrates that Congress intended to provide NMFS with the authority to address harms to marine mammals from vessel traffic, including by requiring vessels to slow down. *See* 1972 H.R. Rep. No. 92-107 (1972), *reprinted in* 1972 U.S.S.C.A.N. 4144.

Right whales are also protected under the ESA, a statute designed to save endangered species from extinction. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 690 (1995); *see also* 16 U.S.C. § 1531(b). The ESA reflects "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth.*, 437 U.S. at 185. The ESA is not simply intended to maintain an endangered species on life support, however, but to conserve it—i.e., recover it to the point where the statute's protections are no longer necessary. 16 U.S.C. § 1531(b), (c) (conservation purposes and policy); *id.* § 1532(3) (defining conserve). Thus, the ESA seeks "to ensure the recovery of endangered . . . species, not merely the survival of their existing numbers." *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 550–51 (9th Cir. 2016).

NMFS is undoubtedly "frustrating the statutory goal[s]" of the MMPA and the ESA by unreasonably delaying final action on Plaintiffs' 2020 Petition. *See Cutler*, 818 F.2d at 898. Congressional directives to conserve endangered species "carry substantial weight in judging the reasonableness of the [agency's] delay." *Biodiversity Legal Found.*, 285 F. Supp. 2d at 15; *In re Am. Rivers*, 372 F.3d at 419–20 (in finding delay unreasonable, weighing agency's "neglect[ of] a petition seeking action under a law designed to halt and reverse the trend toward species extinction[.]") (citation omitted).

The D.C. Circuit has held that the second *TRAC* factor weighs in favor of finding unreasonable delay when an agency has created a situation in which its inaction "effectively nullified" a legal directive. *In re Core Commc'ns, Inc.*, 531 F.3d 849, 856 (D.C. Cir. 2008). Over

the last decade, the right whale has already lost all of the progress toward recovery it had made during the decade before that. *See* Ex. 2 at 3–4 (graph and table depicting species' drastic population decline). If NMFS continues to fail to act, the MMPA's and ESA's mandates that it recover the right whale will be further nullified as the right whale population continues to suffer preventable vessel strikes, pushing it closer to extinction. *See* supra at 7–11, 19. This is wholly inconsistent with NMFS's statutory mandates. *See, e.g.*, *In re Am. Rivers*, 372 F.3d at 414, 420 (ordering agency to respond to a petition within 45 days because inaction could increase risk of extinction of a species). Because both the ESA and MMPA mandate that NMFS act to conserve the right whale and protect it from the existential threat of vessel strikes, the second *TRAC* factor weighs heavily in Plaintiffs' favor.

### III.    The Consequences of Delay Are Severe Because the Right Whale Is Spiraling Toward Extinction

Under the third "and perhaps most critical[]" *TRAC* factor, a court must consider "the consequences of the agency's delay." *Cutler*, 818 F.2d at 898. Here, the consequence of continued delay is unconscionable—further population losses due to vessel strikes to the highly imperiled right whale already experiencing a rapid and severe decline.

The right whale is so critically endangered that "even one additional death a year increases the odds that the [species] will go extinct." *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aero. Workers Local Lodge 207 v. Raimondo*, 18 F.4th 38, 41 (1st Cir. 2021); *see also* Ex. 3 at 2. Yet in 2020 and 2021, vessel strikes in U.S. waters alone killed or seriously injured *four* right whales. *See* Ex. 4 at 6–7.

NMFS itself has repeatedly recognized that the right whale's extinction is almost certain in the immediate future if existing threats are not dramatically reduced. *See, e.g.*, 2020_PET 002125; *supra* at 8–9 (describing NMFS's statements regarding the importance of protecting

every individual whale). The right whale's well-documented perilous status demonstrates why NMFS can—and must—use its authorities to expand the 2008 Vessel Speed Rule to reduce the lethal and sublethal effects of vessel strikes, as Plaintiffs' 2020 Petition demands. With the right whale's survival and recovery in the balance, NMFS's delay is patently unreasonable. The third *TRAC* factor weighs heavily in Plaintiffs' favor.

## IV.   Conserving the Critically Endangered Right Whale Is and Must Be an Agency Priority

Finally, under the fourth *TRAC* factor, the Court must consider an agency's other regulatory priorities. *See Cobell*, 240 F.3d at 1096. Here, conservation of the right whale—one of the world's most endangered whales—is and should be one of NMFS's top priorities.

First, both the ESA and the MMPA irrefutably establish NMFS's priorities. Protecting critically endangered right whales, whose population is suffering from a steep decline, from continued death and injury via vessel strikes is an obvious priority for an agency directed to "protect[ ]" marine mammals "to the greatest extent feasible[.]" 16 U.S.C. § 1361(6).

Second, NMFS *has already concluded* that protecting right whales is a leading priority. For example, the agency has referred to the species' situation as a "conservation crisis" and acknowledged that "protecting every individual is a top priority. Right whales cannot withstand continued losses of mature females—we have reached a critical point." Ex. 6 at 2. In fact, the agency has stated that "[p]reventing any additional deaths of North Atlantic right whales *is our highest priority*." *Id.* (emphasis added); *see also* Ex. 7 at 1 ("Every single female North Atlantic right whale and calf are vital to this species' recovery.").

Additionally, the agency has included the right whale as one of nine species in the agency's "Species in the Spotlight." NMFS created the program under the ESA to prioritize agency resources and actions for species with the highest risk of extinction. 2020_PET 002125.

NMFS considers these species "[a] recovery priority #1C," meaning "extinction is almost certain in the immediate future because of rapid population decline or habitat destruction, and conflicts with construction, development, or economic activity." *Id.* NMFS developed five-year action plans for each species that outline "targeted efforts . . . vital for stabilizing their populations and preventing their extinction." *Id.* In the right whale action plan, NMFS concluded that reducing the risk of vessel strikes is one of the top measures necessary to protect the whale's continued existence. 2020_PET 002131; *see also* Ex. 3 at 3 (NMFS noting it "needs to do more" to protect right whales from vessel strikes).

In short, the right whale's dire conservation situation, the MMPA's and ESA's mandates, and NMFS's own admissions demonstrate that protecting the right whale from the lethal and sublethal impacts of vessel strikes must be a top priority for the agency's regulatory actions. There is no justification for further delay in taking final action on Plaintiffs' 2020 Petition. *Biodiversity Legal Found.*, 285 F. Supp. 2d at 16 (finding delay becomes unreasonable when a species' "extinction [is] expected in less than two decades," despite competing agency priorities).

## REMEDY

NMFS's delay in taking final action on Plaintiffs' 2020 Petition to expand the 2008 Vessel Speed Rule is unreasonable. The APA directs that the Court "shall . . . compel agency action . . . unreasonably delayed." 5 U.S.C. § 706(1).

The Court should declare that NMFS has unreasonably delayed taking final action on Plaintiffs' 2020 Petition. Declaratory judgment is particularly appropriate, where—as here—the agency has a history of delaying actions to protect right whales. *See Forest Guardians v. Johanns*, 450 F.3d 455, 462 (9th Cir. 2006) ("[A] declaratory judgment could help to remedy the

effects of the agency's statutory violations and to ensure that similar violations would not occur in the future.").

The Court should also establish a deadline for NMFS to take final action on Plaintiffs' 2020 Petition. Courts regularly establish deadlines for agency action, particularly when the survival of a highly endangered species hangs in the balance. *See, e.g.*, *In re Am. Rivers*, 372 F.3d at 414, 420 (ordering agency action within 45 days); *see also Cutler*, 818 F.2d at 895 (listing cases where courts "intervened to compel an agency unreasonably delaying to speed up its activities"). The Court should therefore order NMFS to comply with the following deadlines for final action on Plaintiffs' 2020 Petition:

1.      If NMFS intends to deny Plaintiffs' 2020 Petition in whole or in part, it must do so within 30 days of the Court's Order, together with a "brief statement of the grounds for denial." 5 U.S.C. § 555(e).

2.      If NMFS intends to grant Plaintiffs' 2020 Petition, it must issue a proposed rule within 45 days of the Court's Order and a final rule within 120 days of publication in the Federal Register of the proposed rule, consistent with the APA's mandate that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." *Id.* § 553(b); *see also Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 724 F. Supp. 1013, 1020 (D.D.C. 1989) ("Once an agency decides to take a particular action, a duty to do so within a reasonable time is created."); *In re Am. Rivers*, 372 F.3d at 419, 420 (to "conclude" a petition for rulemaking, an agency must provide a "judicially reviewable response" that is "coherent" and "unequivocal;" responses that amount to "administrative keep-away" are insufficient).

Plaintiffs also request that the Court retain jurisdiction until such time as NMFS has taken final action on Plaintiffs' 2020 Petition.

**CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary

judgment and enter an order granting Plaintiffs' requested relief.

Respectfully submitted this 4th day of February, 2022,

<u>/s/ Kristen Monsell</u>                        <u>/s/ Jane P. Davenport</u>
Kristen Monsell, DC Bar No. CA00060       Jane P. Davenport, DC Bar No. 474585
CENTER FOR BIOLOGICAL DIVERSITY           DEFENDERS OF WILDLIFE
1212 Broadway, Ste. 800                   1130 17th St NW
Oakland, CA 94612                         Washington, DC 20036
(510) 844-7137 (tel)                      (202) 682-9400 x174 (tel)
kmonsell@biologicaldiversity.org          jdavenport@defenders.org

                                          <u>/s/ Erica A. Fuller</u>
                                          Erica A. Fuller, DC Bar No. MA0001
*Attorneys for Plaintiffs*                 CONSERVATION LAW FOUNDATION
                                          62 Summer St
                                          Boston, MA 02110
                                          (617) 850-1727 (tel)
                                          efuller@clf.org